June 23, 2000

To the Clerk of the Court,

we the following

( Pro Se )        Plaintiffs. Would ask that this petition be filed. We would also ask to be granted the right to proceed, with this Civil Suit in Forma pay peris in accordance with the procedures set forth. We would also ask for the appointment of Counsel. Do to the Fact that none of us are represented by Counsel. Which leaves at a disadvantage to having meager Knowledge and understanding of the Law. Which would cripple each and ever Plaintiff in this proceeding.

Respectfully yours.

Plaintiffs: Shawn Achiek #87535

RECEIVED

JUN 26 2020

AT 8:30_____M
WILLIAM T. WALSH
CLERK

Cumberland County DOC

54 W Broad Street

Bridgeton, N.J. 09302

John Clark   42592

Ofhn Mefn   88166

Dawl Snf   87862

Raymond Bern   48657

Phillip Dault   21823

Mr. Todd Ford Jr #61921

Mr. Kamal K. Martin #49263

I.

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SHAWN ARCHIE SR.#87535
54 W. Broad Street
Bridgeton, N.J. 08302

RECEIVED

JUN 2 6 2020

RAYMOND LAMAR BROWN.#48657
54 W. Broad Street
Bridgeton, N.J. 08302

AT 8:30_____M
WILLIAM T. WALSH
CLERK

KAMAL MARTIN.#49263
54 W. Broad Street
Bridgeton, N.J. 08302

PHILLIP GAULT JR.#21823
54 W. Broad Street
Bridgeton, N.J. 08302

JEFFREY PAGLIONE #
54 W. Broad Street
Bridgeton, N.J. 08302

JOHN CLARK
54 W. Broad Street
Bridgeton, N.J. 08302

DESMOND ROGERS
54 W. Broad Street

2. Bridgeton, N.J. 08302

TODD FORD JR.
54 W. Broad Street
Bridgeton, N.J. 08302

        Plaintiffs- Petitioners

        v.

RICHARD SMITH, in his official capacity
as Warden, Cumberland County Dep't. Corrections
54 W. Broad Street
Bridgeton, N.J. 08302

JODY HIRATA, in her official capacity
as the Deputy County Administrator for Cumberland County
54 W Broad Street
Bridgeton, N.J 08302

CHARLES WARREN, in his official capacity
as Assistant Warden, Cumberland County Dep't. Corrections
54 W. Broad Street
Bridgeton, N.J. 08302

        Defendants- Respondents

CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND PETITION
FOR WRITS OF HABEAS CORPUS

3.         Plaintiffs Shawn Archie Sr, Raymond L. Brown, Kamal Martin, Phillip Gault Jr, Jefferey Paglione, John Clark, Desmond Rogers, and Todd Ford Jr (collectively, "Plaintiffs") on behalf of a class similarly situated detained people in the custody of the Cumberland County Department Of Corrections ("DOC"), of Richard Smith, Warden of the DOC and Jody Hirata, of the Deputy County Administrator For Cumberland, and Charles Warren, Assistant Warden DOC (collectively, "Defendants"), allege as follows

PRELIMINARY STATEMENT

1. The Cumberland County Department of Corrections now has confirmed cases of COVID-19, the disease caused by the highly contagious SARS-CoV-2 virus. For those who become infected, COVID-19 creates significant odds of death or severe illness, which can include extreme chest pain and difficulty breathing, and can in some cases require highly invasive and psychologically traumatic life-support treatments. The global pandemic caused by COVID-19 has been predicted by epidemiologists to be the worst since the 1918 influenza pandemic, one of the deadliest in human history.

2. In the past months, March, April, May and so on, the vulnerable residents of the Cumberland County Correctional Facility, as well as other Correctional Faildties throughout the state of New Jersey, have watched in panic as the COVID-19 epidemic spread across the world, the United States, wondering what, if anything, the Department of Corrections will do to keep them safe. Now that the virus is confirmed to have entered the DOC, the answer is clear: too little and far too late. Like much of society, these residents watched the news and saw the President of the United States and the Governor of New Jersey imploring - and in some instances requiring - all Americans to practice "social distancing" to avoid

4. congregating in groups, to wash their hands and use hand sanitizer regularly, to disinfect frequently touched surfaces, and to seek prompt medical attention if symptoms develop. Unlike the rest of society - people who are able to, and must, heed this guidance - DOC residents cannot. Although they are fully aware of the risks of COVID-19 and the precautions that need to be taken to prevent those risks, Plaintiffs are systematically denied the opportunity to take the same preventative care that others are required or urged to take by local and Federal officials. That is because, despite knowledge of these directives, the DOC has failed to implement many basic procedures - steps as simple as distributing sufficient hygiene products and providing prompt medical attention and testing to those with COVID-19 symptoms. Or to those who have come in direct contact. With someone who has already tested positive. For this deadly virus. - and has waited far too long to implement others. Consequently, experts predict that COVID-19 will "spread like wildfire" in DOC facilities. The DOC has violated Plaintiffs' rights under the Fifth Amendment's Due Process Clause and the Eighth Amendment's protection against cruel and unusual punishment

3. Defendants are the leadership of the Cumberland County Department of Corrections. The named plaintiffs in this lawsuit are eight people who are currently in Defendant's custody. The named plaintiffs were all pretrial detainees at the time of quarantine on 3-23-20.

4. Defendants ongoing failure to take reasonable precautions to prevent the spread and severity of a COVID-19 outbreak gravely jeopardizes the safety of Plaintiffs and all of the approximate       individuals confined in the Cumberland County DOC. While the world watched COVID-19 spread in January and February, Defendants did not act until March, 2020 - over six weeks after the World Health Organization declared a "public health

5. emergency of international concern". On March 17, 2020 inmate Shawn Archie Sr. was sent out during the beginning of the pandemic. For a MRI for a shoulder injury. Which he sustained on October 10, 2019. Some Five months later. Defendants Failed to send Archie out, with any type of preventive equipment. Such as gloves, a mask to prevent him from contracting the virus. Bringing it back to the jail. As well as his assigned housing unit, being D-pod. On March 23, 2020 inmate Shawn Archie Sr. Was quarantined, but not tested for the COVID-19 virus. Do to him coming in direct contact on March 17, 2020, with a Gloucester County official who had symptoms. Who on days later tested positive for the COVID-19 virus. In turn, having direct contact with inmate Archie. The entire D-pod was quarantined on March 23, 2020. Yet no individuals were ever tested for the COVID-19 virus. Even though individuals complained of having (Flu like symptoms). Defendants continuously denied to test for the COVID-19 virus. Even after individuals requested to be tested. At their own, out of pocket expense. Defendants have not taken the necessary steps to ensure Plaintiffs safety. (Exhibit A)

6. Corrections experts recognize that the only way to minimize the harm done by COVID-19 is through "thoughtful down sizing incarcerated population... in tandem with aggressive, responsive prevention measures that are developed and guided by public health and medical experts. EXHIBITS: A through F. Can be viewed for basis and reflections of data. At or around the time of quarantine during March 17, 2020 through month of April 2020

7. Defendants violate the due process rights of pretrial detainees- who are presumed innocent- when they "recklessly Fail[] to act with reasonable care to mitigate the risk" of a condition that Defendants "Knew, or should have Known" posed and excessive risk to health or safety. Darnell v. Pineiro, 849 F. 3d 17, 35 (2d Cir. 2017). (Exhibit D, Declaration For Persons in Detention and Detention Staff COVID-19) Exhibit E, Declaration of

6. Dr. Jonathan Louis Golob and (Exhibit F) Declaration of Dr. Jaimie Meyer

8. Defendants violate the Eighth Amendment by acting with "deliberate indifference" to an "unreasonable risk of serious damage" to a post-conviction detainees health. Helling v. McKinney, 509 U.S. 25, 33-35(1993).

9. Because of Defendants' ongoing, systemic violations of Plaintiffs' constitutional rights, Plaintiffs seek class-wide relief requiring Defendants to join other jurisdictions in providing proper and adequate safety and hygienic supplies. As well as implement other basic policies and procedure that would mitigate the risk to Plaintiffs health and safety.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, specifically 28 U.S.C § 2241 and 42 U.S.C. § 1983.

11. Plaintiffs claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201- 02, by Federal Rules of Civil Procedure 57 and 65 and by the inherent equitable powers of this Court.

12. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur, in this District.

## PARTIES

13. Plaintiff-petitioner Shawn Archie & is currently in the custody of

7. DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. At the time of the incident he was being held in pretrial custody and was presumed to be innocent. Since May 15, 2020 he has pled guilty and is scheduled to be sentenced on July 17, 2020.

14. Plaintiff-petitioner Raymond Lamar Brown is currently in the custody of the DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

15. Plaintiff-petitioner Kamal Martin is currently in the custody of the DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

16. Plaintiff-petitioner Phillip Gault Jr. is currently in the custody of the DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is serving a County sentence.

17. Plaintiff-petitioner Jeffrey Paglione is currently in the custody of the DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is serving a County sentence.

18. Plaintiff-petitioner John Clark is currently in the custody of the DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

19. Plaintiff-petitioner Desmond Rogers is currently in the custody of the DOC

8. at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

20. Plaintiff-petitioner Todd Ford Jr. is currently in the custody of the DOC at the Cumberland County Department of Corrections, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pretrial custody and is presumed innocent.

## STATEMENT OF FACTS

a. COVID-19 is a highly contagious virus that poses a serious risk of injury and death for anyone who is infected.

21. COVID-19 is the disease caused by the SARS-CoV-2 virus that has caused a global pandemic. The World Health Organization ("WHO") estimates that as of June 21, 2020, there are 2.2 million confirmed cases, 120,000 confirmed deaths.

22. The Centers for Disease Control and Prevention ("CDC") estimates that as of June 21, 2020, there are          confirmed cases and          confirmed deaths in all 50 states and the District of Columbia.

23. COVID-19 is highly contagious. COVID-19 is thought to survive for three hours in the air in droplet form that can be inhaled or transferred to surfaces, up to twenty-four hours on cardboard, up to two days on plastic, and up to three days on steel.

24. Due to the highly contagious nature of COVID-19, data and statistical modeling show that absent intervention, the rate of COVID-19 infections

9. has grown, and is expected to grow, exponentially.

25. People in all age brackets are at risk of serious injury and death from COVID-19. (Exhibit E, Declaration of Dr. Jonathan Louis Golob.

26. Although only about "one person in six becomes seriously ill" from COVID-19 the virus causes excruciating pain to those who become ill. One respiratory physician explained, that the lungs "become filled with inflammatory material" and "are unable to get enough oxygen to the bloodstream.

27. Emerging medical research also demonstrates that, in addition to the short-term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term medical conditions, including cardiovascular disease and permanent reduction of lung function.

28. Because of these short-term and long-term dangers, treating COVID-19 requires a team of health care providers, including nurses, respiratory therapists, and intensive care physicians.

29. The available data from the CDC to date shows that, in total 20.7 to 31.4 percent of people who tested positive for COVID-19 require hospitalization, 4.9 to 11.5 percent require admission to the ICU, and 1.8 to 3.4 percent die. Patients in DOC custody who require hospitalization will also require, by DOC policy, a round-the-clock guard by law enforcement and constant shackling while hospitalized, which inhibits emergency medical care.

30. The WHO estimates that the COVID-19 mortality rate is between three and four percent. The CDC estimates that the COVID-19 mortality rate in the United States is between 1.8 and 3.4 percent. By comparison, the

10. mortality rate of seasonal influenza is well below 0.1 percent.

31. The CDC reports that in China, the mortality rate was "as high as 12 percent in the center of the epidemic.

32. There is no vaccine or cure for COVID-19

b COVID-19 has already, and will; spread with a vicious speed in correctional institutions.

33. Like nursing homes, cruise ships, and college dormitories, correctional Facilities are environments that enable, and in fact facilitate, the spread of COVID-19.

34. Because people — staff, residents, contractors, community members, and others — constantly cycle in and out of correctional Facilities, there is an ever-present risk that new carriers will bring the virus into the Facility.

35. Even though correctional institutions screen outsiders, including staff and visitors for symptoms of COVID-19, that will not stop the introduction of COVID-19 from the outside because the CDC confirms that COVID-19 can be spread "before people show symptoms.

36. Correctional Facilities also are highly susceptible to rapid person-to-person transmission of the virus because cramped conditions place residents and staff in close proximity.

37. History also bears out that prisons and jails become breeding grounds for epidemics that eventually spread out to broader communities.

38. The spread of COVID-19 in Cumberland County Department of

11. corrections is not only a risk to Plaintiffs and Defendants' staff, it is a risk to the entire community.

46. New entrants to the jail had not been provided with free hygiene packs at entry and had been told that the jail was out of soap, indigent kits and had none to provide. Residents without access to the Jail's commissary due to lack of funds, status, or new entry to the facility, therefore had no soap for at least a week during the escalation of COVID-19.

47. Defendants also have not provided access to hand sanitizer, have denied residents requests to use hand sanitizer, and have removed hand sanitizer that was previously available to residents and made it so that only staff could use hand sanitizer.

48. Defendants did not provide staff and residents adequate cleaning supplies, free of charge and in the proper concentration, to prevent transmission of the virus from surfaces in housing units or other parts of common space in the facility. The units are cleaned primarily by DOC residents, whose work is not inspected by staff. The people cleaning the units are not provided with masks, gloves, or other equipment that would allow them to protect themselves from germs while conducting a thorough cleaning.

49. Nor have Defendants provided residents and staff with cleaning supplies to clean their own cells, ensuring that residents who share a cell will quickly transmit illness to each other. Residents are instructed to clean their own cells with water and their own soap, and officers have no access to cleaning materials or clean rags to provide residents to wipe down surfaces within their cells. They are then required to use the same bath towels and wash rags to clean and dry their own hands and bodies when they wash their hands or bathe. On at least

12. unit, a closet full of cleaning supplies and clean rags is present, but residents are told they will be punished if they attempt to give out cleaning supplies and clean rags (meaning trustees will be fired).

50. Defendants do not regularly disinfect surfaces in Defendants' facility.

51. Defendants also did not make soap or hygiene supplies available in common areas, recreational areas, or food preparation areas. Defendants have provided neither paper towels nor other means to dry hands after washing them, meaning that residents who do wash their hands must reuse the same bath towels repeatedly or wipe their hands on their jail-issued uniforms.

52. Defendants also do not supply adequate and proper eating utensils. Upon entry into the facility you are issued one disposable spoon, which you have to use during the duration of your stay no matter how long that may be. It is impossible to properly clean this utensil, do to it being a disposable utensil only designed to be used a few items. Rather than hundreds or long term.

53. Defendants also do not provide its residents with proper footwear. The assigned footwear according to the medical provider Dr. Alan Diaz is the main reason why foot fungus is a an going problem at the facility. Do to its residents having to wear the shoes to do everything, including shower in.

54. On March 23, 2020, the DOC quarantined one inmate (Shawn Archie Sr.) whom had direct contact with a Gloucester County official who had tested positive for COVID-19. But was never tested for the virus. On March 23, 2020, 42 residents of D-pod were quarantined in D-pod, do to them having direct contact with (Shawn Archie Sr who had been quarantined in C-pod, by himself.

13-

55. This was a "quarantine" in name only and was ineffective to prevent the spread of the virus. Defendants' failed to test anyone who had been quarantined. Even though they knew that Archie met CDC guidelines for testing. Defendants' staff report that "[T]hese inmates were not quarantined in any meaningful manner. They were housed two to a cell, and the corrections officers who had routinely worked D-pod were not ordered to quarantine. Instead were allowed to continue to work. As if nothing had happened or they were exempt from catching the COVID-19 virus.

56. Defendants had in their custody residents who were showing signs and symptoms, coughing, fatigue, and shortness of breath — as early as January. In some instances were quarantined. Nevertheless, Defendants did not test any residents, even those who presented with symptoms.

57. Many residents have exhibited symptoms of COVID-19 and have not received a test for the virus. Defendants make statements, that no inmates have tested positive for the virus — this is because no inmates were being tested for the virus. The first positive case for the virus from a inmate — came on June 10, 2020. This inmate along with several others were tested. This would be this inmate second time being quarantined for displaying symptoms of COVID-19. But was not tested the first time. Defendants have told other residents who were tested that they were negative for the virus — but refuse to show these residents there test results or any information pertaining to the alledged COVID-19 test.

58. Defendants also have failed to provide sufficiently prompt access to responsive medical treatment. Many residents wait days after submitting requests to see medical personnel, even when they complain of having difficulty breathing — a common symptom of COVID-19.

14

59. Defendants have not implemented the required social distancing policies, and in fact, have encouraged actions that run directly counter to social distancing protocols. Residents of Defendants' facility are housed two-to a cell, are constantly in close contact with each other and with staff, have limited agency to relocate or increase their personal space, and have no control over the movements of others with whom they are required to congregate on a daily basis. They are required to remain in the areas where Defendants order them to be, and are punished if they move without permission, even if they are moving in an attempt to self-quarantine or move away from a person displaying symptoms of illness.

60. Unless special circumstances apply, cells are shared by more than one resident. Those cells are enclosed rooms where social distancing is impossible. The cell's toilet is within a few feet of the bed and other areas of the cell. The cell doors are closed and locked during periods when people are required to be in their cells, preventing air circulation.

61. Residents regularly congregate, and interact freely, in the unit common space — often the only place that they can go when they are not locked in their cells. Even residents who voluntarily seek to avoid close contact with others are forced to break social distancing rules in order to obtain food, seek medical care, attend professional visitation, and engage in daily population counts and other activities required by Defendants.

62. Defendants have also made social distancing impossible by continuing to require [c]ase workers [to] meet with inmates in small offices, some don't wear proper [personal protective equipment] or other distancing measures.

63. Again on March 23, 2020 forty-three (43 inmates were quarantined from D-pod. But not a one of them were tested for the COVID-19 virus.

15.

64. Defendants claim that they do not know how the first positive case — resident came in contact with the virus. Even though the resident had been incarcerated for several consecutive months.

65 Because the first resident to test positive has been incarcerated since before the COVID-19 outbreak began, it is certain that the resident contracted COVID-19 while he was in Defendants' custody

66. According to Defendants, the first resident who tested positive "had complaint of being sick and was then placed in isolation. Defendants failed to test resident the first time — that he was placed in isolation for the COVID-19. Resident was returned to population where he was able to congregate with other inmates. He would display symptoms of the COVID-19 again. Leading up to him being quarantined a second time. This time being tested for the COVID-19 — resulting in a positive test on June 10, 2020

67. Because the virus can be transmitted before symptoms develop, it is highly likely that the resident who tested positive, have already transmitted the virus to other residents, staff members,

68. It is also highly likely that who ever infected the first resident to test positive who has already tested positive has infected other residents at the Cumberland County Department Of Corrections.

69. Department of Corrections Facilities feature many of the characteristics, and operate by many policies, that will lead to spread of COVID-19.

70. Ventilation in Defendants' facility is poor.

71. COVID-19 will continue to spread to Defendants' facility because

16. numerous people in the Cumberland County law enforcement community, who interact with Plaintiffs and proposed class members, have already tested positive for COVID-19.

72. COVID-19 will spread rapidly in Defendants' facility because of the belated and inadequate policies discussed above and the failure to take other policies that are recommended and required by the CDC and other experts.
   c. Incarcerated people are, by definition, at elevated risk for death or serious injury if they contract COVID-19.

73. Like residents of nursing homes, residents of prisons and jails face greater risk of serious injury or death, if they become infected with COVID-19.

74. Incarcerated people in America have poorer health than general population. The Department of Justice estimates that "half of state and Federal prisoners and local jail inmates reported ever having a chronic condition.

75. Individuals incarcerated in Defendants facility also have poorer health than the general population.

76. Plaintiffs and proposed class members are also at heightened risk because they lack access to quality medical care equipped to handle a disease outbreak.

77. Defendants fail to provide plaintiffs and residents with masks. Masks that are designed to be changed on a daily basis. Have to be used for weeks. Becoming tattered, torn, in most cases- useless.

74. Dr. Chris Beyrer a Professor of Epidemiology - For Johns Hopkins Bloomberg School of Public Health - declares that "[E]mergency [of the jail population] should be implemented in tandem with aggressive,

17 responsive prevention measures that are developed and guided by public health and medical experts. (See Exhibit D) (Chris Beyrer M.D report)

79. Dr. Beyrer, reviewing the specific nature of COVID-19- while speaking of specific risks of COVID-19 in Defendants Facility as well as all facilities, and in light of confirmed cases of COVID-19 inside of DOC facility, specifically recommends that "downsizing the inmate population as much as possible will reduce the risk of contraction and transmission of COVID-19- and the attendant risks of serious harm and death - within DOC Facilities.

80. Dr. Jaime Meyer, another Professor of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven Connecticut. Declares that "even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of individuals is a key part of a risk mitigation strategy (See Exhibit F) (Dr. Meyer's Declaration)

81. Immediate testing of all residents who require testing - where that requirement is based not on defendants' subjective and inadequate criteria, but rather on guidance from knowledgeable medical professionals and public health organization — is necessary to reduce the transmission of COVID-19 and ensure the health and safety of Plaintiffs and proposed class members.

82. This testing must include all residents, including asymptomatic residents, who have been in contact with positive COVID-19 cases.

83. Non-punitive quarantine, with full access to phones, mail, video visitation commissary, recreation, and other privileges, for all individuals believed to be exposed to COVID-19 is necessary to reduce the transmission of COVID-19. While being quarantined - one should not be punished. By being denied these

19. privileges.

84. Authorizing regular, in-person monitoring of Defendants' Facility by an independent expert on correctional health is necessary to ensure that the DOC implements practice proven to reduce the transmission of COVID-19 and to ensure the health and safety of Plaintiffs and proposed class members.

# CLASS ALLEGATIONS

85. Pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2), Plaintiffs bring this action as a class consisting of all persons confined or to be confined in the Cumberland County Department of Corrections ("DOC"), including as subclasses: (i) persons confined pre-trial, and (ii) persons confined pursuant to a judgement of conviction. Plaintiffs reserve the right to amend the class definition or establish sub-classes as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

86. **Numerosity:** The class is so numerous that joinder is impracticable. Based upon information and belief, the size of the class is approximately 400 people and is therefore so numerous that joinder is inherently impracticable for that reason alone. Joinder is also inherently impracticable for other, independent reasons. The class includes unnamed, future class members who cannot by definition be joined. Further, proposed class members are highly unlikely to file individual suits on their own, as all are incarcerated and many are indigent, and thus have limited access to their retained or court-appointed counsel due to Defendants' policies, are currently incarcerated, fear retaliation from filing suits against Defendants, and lack access and financial resources to obtain qualified counsel to bring such suits.

19. 87. Commonality:  The claims of the class share common issues of fact and laws, including but not limited to whether Defendants' policies regarding health and hygiene as relevant to the COVID-19 pandemic- policies regarding health and that systemically affect all proposed class members— violate the Fifth and Eighth Amendments to the United States Constitution. The resolution of this question will drive the outcome of the litigation.

88. Typicality:  The claims of Plaintiffs are typical of those of the class as a whole, because each Plaintiff is currently in Defendants' custody and Plaintiffs claims arise from the same policies and procedures(or lack there of) that provide the basis for all proposed class members claims.

89. Adequacy:  Plaintiffs are adequate class representatives who met all of the requirements of Rule 23(a)(4). They have no conflicts of interest in this case with other class members. They will fairly and adequately represent the interests of the class, and each understands the responsibilities of a representative Moving Forward in Pro se until the issue of appointment of Counsel can be addressed Upon the granting of said Counsel. ( Counsel for Plaintiffs will vigrously prosecute the interests of the class and include attorneys with extensive experience with the Factual and legal issues involved in representing jail and prison inmates, in asserting constitutional rights, and/or in pursuing class actions.

## CAUSE OF ACTION

## FIRST CLAIM FOR RELIEF

## FIFTH AMENDMENT

90. The Fifth Amendment to the United States Constitution

20. guarantees pretrial detainees the right to be free from punitive conditions of confinement.

91. Defendants are violating Plaintiffs' and proposed class members' Fifth Amendment rights because "the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Kingsley v. Hendrickson, 576 U.S. 389, 135 S. Ct. 2466, 2473–74 (2015).

92. Defendants are also violating Plaintiffs and proposed class members' Fifth Amendments rights because they "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F. 3d at 35.

93. Defendants have recklessly failed to act with reasonable care to mitigate the risk of COVID-19 to Plaintiffs and proposed class members.

94. Defendants knew of, or should have known, about the risks of COVID-19 to Plaintiffs and proposed class members.

95. Defendants have acted with deliberate indifference towards Plaintiff and proposed class members by failing to safeguard their health and safety adequately.

96. Defendants have exposed Plaintiffs and proposed class members to a substantial — indeed grave — risk of serious harm, including death.

97. Defendants knew of and disregarded the substantial risk to Plaintiffs

21.  and proposed class members' health or safety.

98. Defendants have subjected Plaintiffs and proposed class members to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.

99. Defendants' continued detention to Plaintiffs and proposed class members fails to protect them adequately from the risk of contracting COVID-19.

100. As a result of Defendants' unconstitutional actions, Plaintiffs and the proposed class are suffering irreparable injury.

## SECOND CLAIM FOR RELIEF

## EIGHTH AMENDMENT

101. The Eighth Amendment to the United States Constitution protects Plaintiffs and proposed class members from cruel and unusual punishment.

102. To amount to the infliction of cruel and unusual punishment (1) jail or prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test) and (2) prison officials must have acted with deliberate indifference to the risk posed (a subjective test). Helling, 509 U.S. at 33-35.

103. Plaintiffs and proposed class members are subject to a risk of harm that today's society does not tolerate.

104. Society does not tolerate the risk of exposure to COVID-19 to which

22  Plaintiffs and proposed class members are required daily to engage as a direct result of Defendants' policies and procedures (or lack thereof).

105. Indeed, the State of New Jersey has warned against the dangers of the very behaviors in which Plaintiffs and proposed class members are required daily to engage as a direct result of Defendants' policies and procedures (or lack thereof).

106. Plaintiffs and proposed class members suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

107. Defendants have acted with deliberate indifference to the risk posed to Plaintiffs and proposed class members by COVID-19.

108. Defendants knew of, and know of, the risks that COVID-19 poses to Plaintiffs and proposed class members.

109. The risk of COVID-19 was, and is, obvious to Defendants.

110. Defendants' response to COVID-19 has not been reasonable.

111. As a result of Defendants' actions, Plaintiffs and proposed class members are suffering irreparable injury.

## RELIEF REQUESTED

Where Fore, Plaintiffs and proposed class members respectfully request that the Court:

A. Certify the proposed class and subclasses;

23    B. Enter a temporary restraining order, preliminary injunction, and permanent injunction and/or writ of habeaus corpus requiring Defendants to:

1. Immediately take all actions within their power to reduce the inmate population of the Cumberland County Department of Corrections including but not limited to, releasing as many people as possible through the COVID-19 Response Emergency Amendment Act of 2020, which allows the Department of Corrections "to award additional credits beyond the limits described ... to effectuate the immediate release of persons sentenced for misdemeanors[.]" 67 New Jersey Executive Order No. 103(2020) (March 9, 2020);

2. Appoint an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding how many and which class members to order released so as to ensure that the number of prisoners remaining at the Cumberland County Department of Corrections can be housed consistently with CDC guidance on best practices to prevent the spread of COVID-19, including the requirement that prisoners be able to maintain six feet of space between them and further order that such recommendations take into account CDC guidance concerning health factors that put individuals at elevated risk of death from COVID-19:

3. Ensure that every remaining resident, be housed one to a room, do to the structure and size of the room.

4. Ensure that each inmate receives, free of charge, an individual supply of hand soap, sufficient to allow frequent hand washing; paper towels; toilet paper; running water; and facial tissue;

5. Ensure that all inmates have access to hand sanitizer containing

24. at least 60% alcohol;

6. Conduct immediate testing for anyone displaying known symptoms of COVID 19. And who has come in contact with anyone testing positive for COVID-19.

7. Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

8. Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

9. Appoint an independent monitor with medical expertise to ensure compliance with these conditions, and provide the monitor with unfettered access to medical units, confidential communication with detained individuals in and out of quarantine, and surveillance videos of public areas of the facility;

10. Order a full investigation — to be headed up by the Federal Bureau Of Investigations, into the unethical practices of Defendants, as well as the assigned Medical Director. As where the hidden agendas to mis use Government funding for testing for the COVID-19 has been misused and residents were continuously denied testing. Even after coming in direct contact with positive cases for the COVID-19. As well as displaying symptoms of this deadly virus.

11. Award to the Plaintiffs the full amount of COVID-19 grant fund

that had been disposed to the Cumberland County Department of Corrections in the amount of $3.4 Million Dollars. As well as awarding the Plaintiffs and proposed class members the sum of $62 Million Dollars to be shared equally: and

C. Award such Further relief as this Court deems appropriate.

Dated: June 23, 2020
New Jersey.          Respectfully submitted,

Pro Se: (Plaintiffs   Shawn Archie Sr #89535
                      Shawn Archie R

John Clark 42592
John Clark

Jeffrey J. Paglione
Jeffrey J. Paglione  88166

Desmond Rodgers
Desmond Rodgers 87862

Raymond Brown  48657
Raymond Brown

Phillip Gault 21823
Phillip Gault

Kamal K. Martin #49263
Kamal K. Martin #49263

Mr. Todd Ford Jr. #61921
Mr. Todd Ford Jr. #61921