## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND LAMAR BROWN #48657 54 W. Broad Street Bridgeton, NJ 08302 JOHN CLARK #42595 54 W. Broad Street Bridgeton, NJ 08302 DESMOND RODGERS #87862 54 W. Broad Street Bridgeton, NJ 08302 TODD FORD, JR. #61921 54 W. Broad Street Bridgeton, NJ 08302 And others Similarly Situated <br>                  Plaintiffs, <br>       v. <br> CHARLES WARREN, in his official capacity as Deputy Warden, Cumberland County Dep't. Corrections and John Doe, Acting Warden, Cumberland County Dep't Corrections Defendants. | Civil Action No. 1:20-cv-7907-NLH-KMW |

## BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE FOR IMMEDIATE TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

**FOX ROTHSCHILD LLP**
997 Lenox Drive
Lawrenceville, NJ 08648
kconfoy@foxrothschild.com
jmpollock@foxrothschild.com
pkalish@foxrothschild.com
(609) 844-3033
*Attorneys for Plaintiffs Raymond Lamar Brown, John Clark, Desmond Rodgers and Todd Ford, Jr. And others Similarly Situated at the Cumberland County Jail*

# **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................ 1

II.     FACTUAL BACKGROUND ..................................................................... 3

      A.     COVID-19 Poses a Grave and Immediate Threat—and the Threat is Growing With the New Strain of the Virus .................................... 3

      B.     The Cumberland County Wardens Have Failed at Every Turn To Protect the Inmate Population ............................................................ 7

      C.     Those in Custody are Not Quarantined Against Exposure or Spreading the Virus .......................................................................... 8

III.     ARGUMENT .......................................................................................... 10

            PLAINTIFFS ARE ENTITLED TO AN ORDER GRANTING IMMEDIATE TEMPORARY AND PRELIMINARY RELIEF ...... 10

      A.     PRELIMINARY INJUNCTION IS WARRANTED BECAUSE THE INMATES HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ......................................................... 11

      B.     An Immediate Preliminary Injunction is Necessary to Prevent Irreparable Injury .......................................................................... 17

      C.     The Threatened Injury to Plaintiffs Outweighs the Harm to Defendants ...................................................................................... 19

      D.     Immediate Preliminary Injunctive Relief Promotes the Public Interest ............................................................................................ 20

      E.     Class Action is the Proper Means of Proceeding to Protect all Members of the Class .................................................................... 21

IV.     Conclusion ............................................................................................. 23

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abu-Jamal v. Wetzel*,
  No. 3:16-cv-2000, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017) ............................22

*Bell v. Wolfish*,
  441 U.S. 520 (1979).........................................................................................11

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
  229 F.3d 254 (3d Cir. 2000) ...........................................................................10

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992) ..............................................................................18

*Chapman v. Federal Bureau of Prisons*,
  291 F. Supp. 3d 1260 (D. Colo. 2018)............................................................14

*Council of Alternative Political Parties v. Hooks*,
  121 F.3d 876 (3d Cir. 1997) ...........................................................................22

*Cristian A.R. v. Decker*,
  453 F. Supp. 3d 670 (D.N.J. 2020) .................................................................19

*DeShaney v. Winnebago County Dep't. Soc. Servs.*,
  489 U.S. 189 (1989).................................................................................12, 14

*Desmond v. Becker*,
  477 F. Supp. 3d 357 (D.N.J. 2020) .................................................................19

*Estelle v. Gamble*,
  429 U.S. 97 (1976)...........................................................................................13

*Farmer v. Brennan*,
  511 U.S. 825 (1994).................................................................12, 13, 15, 16

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
  847 F.2d 100 (3d Cir. 1988) .....................................................................11, 18

*Gates v. Collier*,
  501 F.2d 1291 (5th Cir. 1974) ........................................................................14

*Helling v. McKinney*,
　509 U.S. 25 (1993)..................................................................................13, 14, 15

*Hubbard v. Taylor*,
　399 F.3d 150 (3d Cir. 2005) ................................................................11

*Hudson v. Palmer*,
　468 U.S. 517 (1984)................................................................................12

*Hutto v. Finney*,
　437 U.S. 678 (1978)..........................................................................13, 14, 15

*Instant Air Freight Co., v. C.F. Air Freight, Inc.*,
　882 F.2d 797 (3d Cir. 1989) ................................................................18

*Johnson v. Wetzel*,
　209 F. Supp. 3d 766 (M.D. Pa. 2016)..................................................22

*Kevin v. Decker*,
　457 F. Supp. 3d 445 (D.N.J. 2020) ......................................................19

*Kolawole O.T. v. Ahrendt*,
　466 F. Supp. 3d 457 (D.N.J. 2020) ......................................................11

*Kongtcheu v. Secaucus Healthcare Ctr.*,
　LLC, No. 2:13-cv-1856, 2014 WL 2436048 (D.N.J. May 30, 2014) ...............11

*Martinez-Brooks v. Easter*,
　459 F. Supp. 3d 411 (D. Conn. 2020)..................................................20

*Mata v. Saiz*,
　427 F.3d 745 (10th Cir. 2005) ............................................................14

*McCormick v. City of Wildwood*,
　439 F. Supp. 769 (D.N.J. 1977) ..........................................................12

*McDonnell v. City and County of Denver*,
　878 F.3d 1247 (10th Cir. 2018) ..........................................................21

*Perkins v. Kan. Dep't of Corrections*,
　165 F.3d 803 (10th Cir. 1999) ............................................................16

*Pinson v. Pacheco*,
  397 F. App'x. 488 (10th Cir. 2010) .....................................................................19

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ...............................................................10, 11, 18

*In the matter of the Request to Modify Prison Sentences, Expedite
  Parole Hearings, and Identify Vulnerable Prisoners*,
  242 N.J. 357 (2020) ...........................................................................................17

*Rhodes v. Chapman*,
  452 U.S. 337 (1981).............................................................................................20

*Roman v. Wolf*,
  977 F.3d 935 (9th Cir. 2020) ............................................................................19

*Saint Barnabas Med. Ctr. v. Essex County*,
  111 N.J. 67 (1988) ..............................................................................................13

*Self v. Crum*,
  439 F.3d 1227 (10th Cir. 2006) ........................................................................13

*Shannon v. Graves*,
  257 F.3d 1164 (10th Cir. 2001) ........................................................................13

*Thakker v. Doll*,
  451 F.Supp.3d 358 (M.D. Pa. 2020).................................................................19

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................19

## I.   PRELIMINARY STATEMENT

COVID-19 poses an unprecedented risk to those in the custody of the Cumberland County Jail. Plaintiff inmates on their own behalf and on behalf of all those similarly situated housed in the Jail ("Plaintiffs" or "Inmates"), seek immediate relief to protect them from the ongoing spread of this highly infectious and deadly virus. Plaintiffs seek the following fundamental basics in order to minimize the risk of infection with COVID-19 while incarcerated:

1.   N95 masks to prevent or reduce the risk of inhalation of the virus;

2.   Cleaning service or at a minimum sufficient cleaning materials so that the Inmates can be protected against this highly contagious virus—and the newer strains even more easily transmitted;

3.   Nutritious food;

4.   Social distancing to the greatest extent possible;

5.   Testing for exposure to the virus—the Cumberland County Jail commenced testing once and then ceased when the rate of infection appeared too high. The Inmates, as well as the Correctional Officers, nurses and staff and their families have the right to know if they have been exposed so that they can protect themselves and their families; and

6.   A Neutral to inspect the Jail and report and recommend what other steps can be taken to provide fundamental protections to ensure Inmates constitutional rights are protected, including consideration of overcrowding and compassionate release.

In considering this request for protections against COVID-19, consistent with the federal and State Constitutional afforded pretrial and sentenced inmates, it must be borne in mind that the Jail is one community when it comes to COVID-19.

That community consists of the Inmates, the Correctional Officers, and the other Staff (such as health and safety and food service). The virus is readily transmitted and affects Inmates, Correctional Officers, health and administrative staff without favor. Those in the Jail community all breathe the same air, walk many of the same areas, and exist in the same space.[1]

Because all Inmates in the Cumberland County Jail face the same or similar exposure, are all denied the equipment, supplies and means needed to take reasonable precautions against the spread of the virus and receive the same lack of treatment and care, and all suffer from substantially the same effects of COVID-19 exposure, a Class Action is both the proper means of proceeding and most judicially efficient.  All members of the Class seek the same relief—an injunction addressing the failures in COVID-19 testing, protection, procedures (quarantine and isolation), and a neutral monitor to investigate Jail conditions and to report and recommend to

---

[1] On April 23, 2020, PBA Local 231, representing the Correctional Officers working at the Cumberland County Jail filed suit in Cumberland County Superior Court, alleging essentially the same actions and inactions of Defendants, *i.e.* that they "failed to develop effective policies and procedures to combat the threat of the pandemic, failed to order the equipment necessary to adequately protect … and allowed certain policies and procedures to stay in place that actually made employees… less safe." A Second Amended Complaint was filed in August renewing these allegations and offering additional support. *See* Certification of Karen A. Confoy ("Confoy Cert."). Ex. A, Second Amended Complaint CUM-L-250-20 dated August 26, 2020.

the Court what steps can and should be taken immediately at the Cumberland County Jail to get control of the spread of COVID-19.[2]

## II.   FACTUAL BACKGROUND

### A.   COVID-19 Poses a Grave and Immediate Threat—and the Threat is Growing With the New Strain of the Virus

On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic.[3] Since then, more than 100 million people have contracted COVID-19 worldwide and almost a million and a half have died.[4] In the United States, more than 25 million people have tested positive and more than 420,000 have

---

[2] The COVID-19 outbreaks amongst the Inmates and Correctional Officers have been covered by the press and have been brought to the attention of County Freeholders. *See e.g.* Confoy Cert. Ex. B. (https://www.inquirer.com/health/coronavirus/coronavirus-outbreak-cumberland-county-jail-new-jersey-20201204.html); Confoy Cert. Ex. B (https://www.thedailyjournal.com/story/news/2020/10/29/nj-cumberland-county-jail-coronavirus-covid-outbreak-blame-police-benevolent-association/6074799002/); Confoy Cert. Ex. C (https://www.nj.com/coronavirus/2020/12/covid-19-outbreak-sickens-70-at-county-jail-officials-fight-over-whos-to-blame.html); Confoy Cert. Ex. D (https://www.insidernj.com/press-release/surrency-doc-commish-inspect-county-jail-send-covid-enforcement-team-asap/); Confoy Cert. Ex. E (https://whyy.org/articles/clean-pajamas-are-not-enough-critiques-of-new-jersey-jails-mount-amid-pandemic/); Confoy Cert. Ex. F

[3] *See* Confoy Cert. Ex. G, World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[4] *See* Confoy Cert. Ex. H, https://coronavirus.jhu.edu/ (1/26/21).

died. There were 151,112 new cases as of January 25th, and roughly 3,000 Americans died every day last week–one death every 30 seconds of the day.[5]

Hospitalizations across the Country remain high, with one-fifth of U.S. hospitals reporting that at least 95 percent of their intensive care unit beds were full,[6] threatening the overall healthcare system and taking a heavy mental and physical toll on doctors, nurses, and other frontline responders. As predicted, things have gotten much worse following the Thanksgiving and Christmas holidays, not only because of the increased number of infections but also due to the higher rate of transmission from the new variants of COVID-19 which are more difficult for the body to fend off, more easily transmitted, and potentially less susceptible to treatment.

Concerns about the spread of infectious disease in a generally comprised inmate population are not new. Even with the flu, the CDC had recommended Rapid Detection of Cases" to be done via testing of people with influenza-like illnesses to determine what viruses were circulating at the institution.[7]

---

[5] *See* Confoy Cert. Ex. I, https://coronavirus.jhu.edu/region/united-states (1/26/21).

[6] *See* Confoy Cert. Ex. J, https://www.nytimes.com/interactive/2020/us/covid-hospitals-near-you.html (1/25/21).

[7] *See* Confoy Cert. Ex. S, https://www.cdc.gov/h1n1flu/guidance/correctional_facilities.htm

Prisoner populations are sicker than the general population. A 2018 study in The Lancet that incarcerated individuals have a higher burden of infectious illnesses such as HIV, hepatitis B and C, syphilis and tuberculosis than non-incarcerated individuals.[8] Further, incarcerated populations have chronic, noninfectious diseases such as COPD, heart failure and kidney disease which also increase the risk for infections such as coronavirus. *Id*. There are also clear indications that mortality is higher among the senior population. [9]

According to the CDC, COVID-19 spreads "mainly person-to-person between those "who are in close contact with one another (within about 6 feet)". The most common symptoms of COVID-19 include fever, cough, and shortness of breath.[10] In order to contain the spread, the CDC emphasizes the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch"

---

[8] *See* Confoy Cert. Ex. T, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext

[9] *See* Confoy Cert. Ex. U, Four declarations attached to the original Complaint attesting to prison conditions generally.

[10] *See* Confoy Cert. Ex. K, Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

surfaces, and wearing cloth face covering to curtail the spread of the virus.[11] These

measure are essential as asymptomatic individuals transmit the virus, and people

who are symptomatic will have been contagious for two days before they showed

symptoms.[12]

New COVID variants as well as the original COVID-19 are now circulating

rapidly in the United States.  According to the CDC the  new variants (a) spread

more rapidly, (b) have decreased susceptibility to therapeutic agents (i.e., it is less

prone to treatment than the original COVID-19, (c) are more effective than the

original strain of COVID at evading the body's natural defenses, and (d) can be

either be milder or more severe than COVID-19.[13]

---

[11] *See* Confoy Cert. Ex. L, Ctrs. for Disease Control and Prevention, *Prevent
Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/index.html

[12] *See* Confoy Cert. Ex. M, *CDC Director On Models For The Months To Come:
'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-
shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-
virus-is-going-to-be-with-us; *see also* Confoy Cert. Ex. N, Apoora Mandavilli,
Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. Times
(Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-
asymptomatic-transmission.html.

[13] *See* Confoy Cert., Exs. O and P (Interim: Implications of the Emerging SARS-
COV-2 Variant VOC 202012/01 (Center for Disease Control); Emerging Sars-COV-
2 Variants (Center for Disease Control)).

The situation is equally dire in Cumberland County. There have been several serious outbreaks of COVID-19 amongst the Inmates and Correctional Officers since the first case identified in March 2020, as well ongoing cases not part of the larger outbreaks. Public information shows that over 20% of the Inmate population (between 50 and 60 reported cased in the Inmate population of 260), and over a dozen Correctional Officers were infected with the virus during the most recent outbreak in December 2020.[14]

### B. The Cumberland County Wardens Have Failed at Every Turn To Protect the Inmate Population

Faced with a Constitutional duty to provide adequate care for its inmates, Defendants failed the Inmates, the Correctional Officers and the Staff. Inmates have routinely become infected with COVID-19 as a result of exposure to infected Correctional Officers (and a number of Correctional Officers have advised that they have become infected as a result of the Jail's failure to provide masks or treatment to the inmates). *See* Certification of John Clark ("Clark Cert."), at ¶ 6; Certification of Desmond Rodgers ("Rodgers Cert.") at ¶ 7; Certification of Todd Ford, Jr. ("Ford Cert.") at ¶ 6; Certification of Raymond Lamar Brown ("Brown Cert.") at ¶ 6. There is no routine testing of inmates, and many inmates have only been tested a single time since the pandemic began. Clark Cert. at ¶¶ 19, 22; Rodgers Cert. at ¶¶ 19, 22;

---

[14] *See* Confoy Cert. Exs. B-F.

Ford Cert. at ¶¶ 19, 21; Brown Cert. at ¶¶ 19, 22. Over 60 inmates and a number of Correctional Officers have been infected. Clark Cert. at ¶ 8; Rodgers Cert. at ¶ 10; Ford Cert. at ¶ 9; Brown Cert. at ¶ 8. No reasonable precautions have been taken to prevent the spread of COVID-19 within the Jail. Clark Cert. at ¶ 12; Ford Cert. at ¶ 13; Brown Cert. at ¶ 12.  Inmates have been provided at best a flimsy cloth mask and no inmate has been provided an N95 mask. Clark Cert. at ¶¶ 13-14; Rodgers Cert. at ¶¶ 14-15; Ford Cert. at ¶¶ 14-15; Brown Cert. at ¶¶ 13-14.  New Inmates are not tested and it is voluntary. Clark Cert. at ¶ 20; Rodgers Cert. at ¶ 20; Ford Cert. at ¶ 23; Brown Cert. at ¶ 20. The Jail is not properly sanitized nor are the inmates provided cleaning supplies. Clark Cert. at ¶ 25; Rodgers Cert. at ¶ 23; Ford Cert. at ¶ 27; Brown Cert. at ¶ 25. Social distancing is simply non-existent. Clark Cert. at ¶ 26; Rodgers Cert. at ¶ 24; Ford Cert. at ¶ 28; Brown Cert. at ¶ 26.

## C.   Those in Custody are Not Quarantined Against Exposure or Spreading the Virus

Commencing in March/April during the beginning of the pandemic, Cumberland Jail quarantined inmates who reported COVID-19 symptoms without providing COVID-19 tests or medical treatment. Ford Cert. at ¶ 8; Rodgers Cert. at ¶ 7. In October, when Warden Smith began a short period of testing  the Inmates, over half of the facility was quarantined as result of positive tests. Ford Cert. at ¶ 21. In certain housing units of Cumberland Jail where there are no cells, inmates quarantine in an open environment. Ford Cert. at ¶ 25. In other areas of Cumberland

Jail, inmates quarantine in their cell with another inmate, whether or not that inmate has shown symptoms. Ford Cert. at ¶ 25. Inmates who are quarantined are not tested for COVID-19 prior to being released into the general population, thus they could be still be infectious and spread the virus to other inmates. Clark Cert. at ¶ 23; Brown Cert. at ¶ 23; Ford Cert. at ¶ 25. Cumberland quarantines inmates in cell units that share vents with cell units in other parts of the Jail, allowing COVID-19 to travel through the vents and infect even more inmates. Rodgers Cert. at ¶ 21. Cumberland has failed to implement an effective quarantining protocol to stop the spread of COVID-19.

Moreover, because new entry inmates are constantly entering Cumberland, there is an ever present risk that COVID-19 can be brought in from the outside. New entry inmates are not required to be tested for COVID-19. Clark Cert. at ¶ 20; Rodgers Cert. at ¶ 20; Ford Cert. at ¶ 23; Brown Cert. at ¶ 20. This is because testing of new entry inmates is voluntary, rather than required. Clark Cert. at ¶ 20; Rodgers Cert. at ¶ 20; Ford Cert. at ¶ 23; Brown Cert. at ¶ 20. There is also no routine testing of correctional officers, who go back and forth from the Jail every day and could be exposed to COVID-19. Clark Cert. at ¶ 21; Rodgers Cert. at ¶ 22; Ford Cert. at ¶ 24; Brown Cert. at ¶ 21.

### III.   ARGUMENT

### PLAINTIFFS ARE ENTITLED TO AN ORDER GRANTING IMMEDIATE TEMPORARY AND PRELIMINARY RELIEF

Rule 65 of the Federal Rules of Civil Procedure allows a party to move for injunctive relief in the form of a temporary restraining order. In the Third Circuit, the movant must meet the threshold for the first two most critical factors: "it must demonstrate that it can win on the merits (which requires showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). When these two factors are met, preliminary relief is warranted where the party seeking relief makes a showing that "all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*; *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) ("A District Court ... balances these four factors to determine if an injunction should issue.") (citations omitted)); *Kolawole O.T. v. Ahrendt*, 466 F. Supp. 3d 457, 466 (D.N.J. 2020).

Because injunctive relief is an equitable remedy, the courts have counseled that the test for determining whether issuance of an injunction is appropriate must be administered with flexibility. *See Reilly*, 858 F.3d at 178. Standards for issuing a temporary restraining order and a preliminary injunction are "the same" and can therefore be analyzed together. *Kongtcheu v. Secaucus Healthcare Ctr.*, LLC, No.

2:13-cv-1856, 2014 WL 2436048, at *2 (D.N.J. May 30, 2014) (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

### A.  PRELIMINARY INJUNCTION IS WARRANTED BECAUSE THE INMATES HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs have a substantial likelihood of succeeding on the merits of their Constitutional claims. As pretrial detainees, Plaintiffs are protected under the Due Process Clause from conditions of confinement which constitute punishment. *Hubbard v. Taylor*, 399 F.3d 150, 157-58 (3d Cir. 2005) (*citing Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In deciding what constitutes punishment the courts will consider whether the condition complained of has a legitimate governmental objective. *Id.* at 158. More broadly, conditions of incarceration that pose an unreasonable risk of harm violate the Eighth Amendment's prohibition against cruel and unusual punishment[15], even if that harm has not yet come to pass. Clearly, Defendants decisions to deliberately maintain conditions within the Jail that deny Plaintiffs even basic protections from exposure to COVID-19 not only do not relate to any legitimate governmental interest, but Defendants' actions and omissions have given rise to conditions of confinement constituting cruel and unusual punishment.

---

[15] The same obligation is imposed by Article I, paragraph 12 of the New Jersey State Constitution ("Excessive bail shall not be required, excessive fines shall not be imposed, and cruel and unusual punishments shall not be inflicted.")

Plaintiffs and all proposed Class members are subject to the same conditions; all are entitled to relief.

The government must "take reasonable measures to guarantee the safety of the inmates" under their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). In its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide inmates with "basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety…." *DeShaney v. Winnebago County Dep't. Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)(government officials must provide medical care and "are not free to let nature take its course"); *McCormick v. City of Wildwood,* 439 F. Supp. 769, 776 (D.N.J. 1977) ("[A] jailer's duty to provide reasonable medical care is non-delegable. This duty attaches as soon as a prisoner is placed under the jailer's custody."); *Saint Barnabas Med. Ctr. v. Essex County,* 111 N.J. 67, 74 (1988) ("As a matter of both state and federal law, defendant Essex County had an absolute duty to see that [the prisoner] received medical treatment for his injuries.").

To establish an Eighth Amendment claim, a plaintiff must satisfy "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The objective component requires a prisoner to demonstrate that he has a "sufficiently serious" medical need. *Id.* at 1230; *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "For a claim (like the

one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted); *see Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)); *see also Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001) ("There is no requirement that an inmate suffer serious medical problems before the condition is actionable"). Thus, "[t]he question is not limited to whether the inmate's symptoms render a medical need sufficiently serious, but also extends to whether the potential harm to the inmate is sufficiently serious." *Chapman v. Federal Bureau of Prisons*, 291 F. Supp. 3d 1260, 1265 (D. Colo. 2018) (citing *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)).

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet has happened.

*Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). The Court in *Helling* specifically recognized that the risk of contracting a communicable disease could constitute such an "unsafe, life-threatening condition":

> In *Hutto v. Finney*, 437 678, 682 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that

13

> the likely harm would occur immediately and even though the possible infection might not affect all of those exposed . . . . Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33; *see also id.* at 34 (citing with approval *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), which held that Inmates were entitled to relief under the Eighth Amendment when they showed, *inter alia*, "the mingling of inmates with serious contagious diseases with other prison inmates").

In this case, Plaintiffs are at serious risk of severe illness or death from COVID-19. Thus, as the Court recognized in *Helling* and *Hutto,* the Constitution "require[s] a remedy" that ensures that protection of Plaintiffs' safety. *Helling*, 509 U.S. at 33.

The subjective prong requires a showing that the defendants "knew of and disregarded an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837; In other words, "a prison official must have a 'sufficiently culpable state of mind,'" which in the present context means a state of mind "of 'deliberate indifference' to inmate health or safety." *Id.* at 834. (citation omitted).

A prison official acts with deliberate indifference in violation of the Eighth Amendment if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that

inference." *Id*. at 837. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. When such a showing is made, the claimant "'does not have to await consummation of the threatened injury to obtain preventive relief.'" *Id*. at 845 (citation omitted); *see also Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

Plaintiffs satisfy the subjective prong because the evidence shows that Defendants (1) know of and (2) are disregarding an excessive risk to their health and safety. *See, e.g.*, *Farmer*, 511 U.S. at 834; *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 809 (10th Cir. 1999). There is no question that Defendants are and have been since at least the time of the first outbreak of COVID-19 at the Jail in March 2020, well aware of the danger COVID-19 presents to Inmates. Despite that knowledge, Defendants have failed to implement and/or carry out policies and procedures to prevent the spread.

The minimum measures that should have been taken by Defendants are no secret. The CDC published guidance which it continues to update, and the New Jersey Department of Corrections ("NJDOC") and the federal Board of Prisons have

implemented policies and procedures and taken specific actions to mitigate the spread of the virus in State and federal prisons, including issuing masks, mandating that masks be worn, implementing universal testing; imposing effective quarantining rules; enforcing social distancing providing enhanced cleaning and sanitizing services, and giving inmates access to hand sanitized, and other personal cleaning supplies. *See, e.g. In the matter of the Request to Modify Prison Sentences, Expedite Parole Hearings, and Identify Vulnerable Prisoners*, 242 N.J. 357, 374 (2020)(noting among other things that the NJDOC committed to testing all inmates and staff for COVID-19, and found that 13.2 % of the inmates tested positive, and 46 died from the virus, and that changes circumstances brought on by COVID -19 mandate a new response).[16] The Defendants, in deliberate indifference to the health and safety of the inmates, have given, at best, lip service to these types of measures.

All Inmates have been and continue to be denied access to clean, effective, adequate masks. Defendants have refused to provide essential sanitizing and cleaning supplies. Defendants do not require new inmates to be tested; have denied requested testing to Inmates who have been exposed to COVID-19 and/or are exhibiting symptoms, and ceased the only universal testing program in October after

---

[16] *See also* Confoy Cert. Ex. Q, New Jersey Department of Corrections COVID-19 updates at https://www.state.nj.us/corrections/pages/COVID19Updates.shtml.

too many Inmates tested positive. Defendants have not effectively isolated infected and ill inmates, even quarantining and isolating them in close proximity to the uninfected and without protection. Defendants have repeatedly falsely denied the high rate of infection and publicly misrepresented that measures have been and are being taken to contain the spread of COVID-19. But these denials cannot withstand the evidence of Defendants' deliberate disregard of the health and safety of the inmates. By this conduct, Defendants have violated the Inmates' Due Process and Eighth Amendment constitutional rights.

### B.  An Immediate Preliminary Injunction is Necessary to Prevent Irreparable Injury

The circumstances of Plaintiffs' incarceration establish that they are suffering, and will continue to suffer irreparable harm absent immediate relief from this Court.

To obtain a TRO or preliminary injunction, Plaintiffs must show they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. Irreparable harm is often suffered when the harm "cannot be redressed by a legal or an equitable remedy follow a trial." *Instant Air Freight Co., v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). A "purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *Frank's*, 847 F.2d at 102. Plaintiffs' "showing of irreparable harm is insufficient if the harm will only occur in the indefinite future. Rather, the moving party must make a clear showing of immediate irreparable harm." *Campbell Soup Co. v. ConAgra,*

17

*Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). However, Plaintiffs are not required to demonstrate that the irreparable harm is inevitable, but only that it "is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

Defendants' failure to protect Plaintiffs from the deadly COVID-19 virus and their failure to implement measures which the CDC recommends and which are widely utilized worldwide in an effort to mitigate serious risk of the spread of virus establishes irreparable harm. Indeed, the high rate of infection in the Jail establishes that the serious injury alleged by Plaintiffs is not mere speculation but "is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Pinson v. Pacheco*, 397 F. App'x. 488, 491 (10th Cir. 2010); *see Winter*, 555 U.S. at 22 (Plaintiffs are not required to demonstrate that the irreparable harm is inevitable, but only that it "is *likely* in the absence of an injunction."). Over the last several months, the Judges in this District have repeatedly recognized that it is essential that detention facilities implement measure to prevent the spread of COVID-19 sufficient to protect inmates form the deadly virus . *See Cristian A.R. v. Decker*, 453 F. Supp. 3d 670, 687 (D.N.J. 2020); *Kevin v. Decker*, 457 F. Supp. 3d 445, 459 (D.N.J. 2020); *Desmond v. Becker*, 477 F. Supp. 3d 357 (D.N.J. 2020); s*ee also Thakker v. Doll*, 451 F.Supp.3d 358, 370 (M.D. Pa. 2020)( "The precautions being adopted to stop it should apply equally, if not more so, to the most vulnerable

among us." ); *Roman v. Wolf*, 977 F.3d 935, 944 (9th Cir. 2020) ("The district court also correctly concluded that Plaintiffs were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate."); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 447 (D. Conn. 2020) ("Courts across the country have concluded that the risk of contracting COVID-19 as a result of unsafe conditions of confinement constitutes irreparable harm.") (citations omitted).

### C.   The Threatened Injury to Plaintiffs Outweighs the Harm to Defendants

Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), the risk of serious illness or death from COVID-19 significantly exceeds the inherent discomforts of confinement. While COVID-19 continues to spread, normal conditions of confinement present a deadly threat to Plaintiffs' lives.

Defendants do not routinely test Correctional Officers, Jail staff, or Inmates for COVID-19. Inmates' requests for testing have been denied and/or ignored, despite known exposures to other Inmates who are sick or symptomatic or to Correctional Officers who go out on COVID-19 leave, but only after having worked, with and without symptoms during the period when they were highly contagious. Inmates have not even been informed by Defendants when Correctional Officers working their cell unit has contracted COVID-19.

Further as is well known by now, adequate face coverings, social distancing and hygiene measures are Plaintiffs' first line of defense against COVID-19.[17] Defendants' deliberate disregard of their obligations to ensure the health and safety of the Inmates is apparent from their refusal to provide effective masks and replacement masks, their refusal to provide inmates with both adequate personal hygiene and sanitizing supplies and cleaning supplies for the cells and common areas, their failure to enforce social distancing within units, their failure to provide outside recreation and their neglect of the Inmates' nutritional needs.

These conditions pose even greater risk of infectious spread, and as a result, Plaintiffs face unreasonable harm from COVID-19 because Defendants fail to take any measure to protect them.

### D. Immediate Preliminary Injunctive Relief Promotes the Public Interest

To obtain a preliminary injunction, the movant must demonstrate that "the injunction will not adversely affect the public interest." *McDonnell v. City and County of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018). Protecting the constitutional rights of all individuals is in the public interest. *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883-84 (3d Cir. 1997) ("[[T]he public

---

[17] *See* Confoy Cert. Ex. R (https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/CDC-Activities-Initiatives-for-COVID-19-Response.pdf (last accessed January 26, 2021)).

interest clearly favors the protection of constitutional rights."); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 781 (M.D. Pa. 2016) (the public "interest is particularly strong where the right to be vindicated derives from the United States Constitution"); *Abu-Jamal v. Wetzel*, No. 3:16-cv-2000, 2017 WL 34700, at *20 (M.D. Pa. Jan. 3, 2017) ("[I]ssuance of a preliminary injunction will serve the public interest in that it will vindicate Plaintiff's constitutional right to receive adequate medical care while in the custody of the state."). Here, not only are Defendants violating Plaintiff's constitutional rights by subjecting them to an immense risk of medical harm, but Defendants' actions also continue to put the entire community of all individuals who work in the Jail, as well as each of their families and others they come in contact with outside of the Jail, at unnecessary risk of COVID-19 infection as well.

### E.   Class Action is the Proper Means of Proceeding to Protect all Members of the Class

This action is brought as a Class Action on behalf of all Inmates at the Cumberland County Jail. Inmates at the Jail in every unit are affected by the transmission of COVID-19 and the Cumberland County Jail's failures apply equally to each area of the Jail. All inmates in this Class Action seek an injunction compelling the Defendants to provide the means and ability for all Inmates to follow the guidance of the CDC.

The Class is so numerous that joinder of all members is impracticable, especially during COVID-19, which makes communications with inmates difficult.

There are common questions of law and fact that affect the rights of each member of the proposed class—namely, Cumberland County Jail's failure to provide protection from contracting COVID-19, failure to provide testing of COVID-19 exposure, failure to provide proper nutrition—which leads to decreased ability to ward off COVID-19, failure to provide proper isolation or social distancing to prevent the spread of COVID-19, and failure to provide treatment for those infected with COVID-19. All inmates have been subject to deliberate indifference or intentional failures by the Cumberland County Jail regarding COVID-19.

The claims of the Class members are typical of all members of the Class. The representatives will fairly and adequately protect the interests of all members of the proposed class. The interests of the representatives are consistent with those interests of those of each member of the proposed class. The counsel representing the proposed class are capable and experienced in litigating class actions and are competent to represent the inmates at the Cumberland County Jail.

This action is properly maintained in that each and all of the defendants have failed to protect the inmates civil and Constitutional rights, and they have done so knowingly, willfully, and repeatedly.

Injunctive relief as requested here, if granted, should ensure that all Inmates enjoy the minimal Constitutional protections that the Cumberland County Jail is required to provide to pretrial detainees and sentenced Inmates.

22

## IV.   CONCLUSION

For the foregoing reasons, pursuant to Fed. R. Civ. P. 65, the named Plaintiff Inmates and the putative class they represent respectfully ask the Court to: (1) appoint a Neutral to inspect the Jail and report and recommend what other steps can be taken to provide fundamental protections to ensure Inmates constitutional rights are protected, including consideration of overcrowding and compassionate release; (2) order that Defendants immediately abandon their policies of inaction and, (3) order Defendants to immediately:

1.   Provide every inmate with an N95 mask and provide access to replacement masks on both a regular and as needed basis;

2.   Provide every inmate who requires other or additional personal protective equipment with such equipment, including face shields;

3.   Require each inmate to wear a mask or at all times when in a common area;

4.   Require that all correctional officers and other staff wear personal protective equipment, including masks and gloves, when interacting with inmates, other staff or individuals having access to the Cumberland Jail;

5.   Implement measures to permit physical distancing;

6.   Provide each inmate without cost, an individual supply of hand soap, sufficient to allow frequent hand washing; paper towels; toilet paper; running water; and facial tissue and access to hand sanitizer containing at least 60% alcohol;

7.   Provide adequate cleaning supplies;

8.   Conduct immediate COVID-19 testing for all inmates and staff, including correctional officers, and, on an ongoing basis, conduct

COVID-19 testing of anyone displaying known symptoms of COVID-19 and who has come in contact with anyone testing positive for COVID-19;

9.      Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property; and

10.     Provide proper nutrition.

Dated: January 29, 2021              */s/ Karen A. Confoy*
                                     Karen A. Confoy
                                     Jeffrey M. Pollock
                                     Paul W. Kalish
                                     **FOX ROTHSCHILD LLP**
                                     997 Lenox Drive
                                     Lawrenceville, NJ 08648
                                     kconfoy@foxrothschild.com
                                     jmpollock@foxrothschild.com
                                     pkalish@foxrothschild.com
                                     (609) 844-3033
                                     *Attorneys for Plaintiffs Raymond Lamar Brown, John Clark, Desmond Rodgers and Todd Ford, Jr. And others Similarly Situated at the Cumberland County Jail*

24