# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND LAMAR BROWN, et al.<br><br>Plaintiffs,<br><br>v.<br><br>CHARLES WARREN, et al.<br><br>Defendants. | Civil Action No. 1:20-cv-7907-NLH-KMW |

## PLAINTIFFS' PRE-HEARING MEMORANDUM

**FOX ROTHSCHILD LLP**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
kconfoy@foxrothschild.com
jmpollock@foxrothschild.com
pkalish@foxrothschild.com
(609) 844-3033
*Attorneys for Plaintiffs Raymond Lamar*
*Brown, John Clark, Desmond Rodgers and*
*Todd Ford, Jr. And others Similarly Situated*
*at the Cumberland County Jail*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

STATEMENT OF APPLICABLE LAW ................................................ 7

    DEFENDANT'S ACTIONS AND INACTIONS CONSTITUTE A
    VIOLATION OF THE INMATES' DUE PROCESS AND EIGHTH
    AMENDMENT RIGHTS ............................................................... 7

ARGUMENT ..................................................................................... 11

    POINT I  THE EVIDENCE ESTABLISHES THAT PLAINTIFFS
    ARE ENTITLED TO INJUNCTIVE RELIEF, INCLUDING
    APPOINTMENT OF AN INDEPENDENT MONITOR TO
    OVERSEE COMPLIANCE ........................................................ 11

    POINT II  DEFENDANT CANNOT RELY ON CDC TESTING
    GUIDELINES TO JUSTIFY THE JAIL'S FAILURE TO DETECT
    COVID-19 IN THE JAIL BECAUSE SYMPTOMATIC INMATES
    WERE ROUTINELY DENIED TESTING ................................. 22

    POINT III  A CLASS ACTION SHOULD BE CERTIFIED ..................... 24

CONCLUSION .................................................................................. 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azcona v. Ellis*,
  Civ. No. 21-cv-8526 (FLW), 2021 WL 1139843 (D.N.J. Mar. 25, 2021) ...........................................................................................8, 21

*Baby Neal for and by Kanter v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ...................................................................24

*Bell v. Wolfish*,
  441 U.S. 520 (1979)...............................................................................7

*Chapman v. Federal Bureau of Prisons*,
  291 F. Supp. 3d 1260 (D. Colo. 2018)..................................................9

*Cristian A.R. v. Decker*,
  453 F. Supp. 3d 670 (D.N.J. 2020).....................................................23

*DeShaney v. Winnebago Cty*,
  489 U.S. 189 (1989)...............................................................................9

*Desmond v. Becker*,
  477 F. Supp. 3d 357 (D.N.J. 2020).....................................................23

*E.D. v. Sharkey*,
  928 F.3d 299 (3d Cir.2019) ..................................................................8

*Farmer v. Brennan*,
  511 U.S. 825,837 (1994).............................................................7, 9, 14, 21

*Gates v. Collier*,
  501 F.2d 1291 (5th Cir. 1974) ..............................................................8

*Helling v. McKinney*,
  509 U.S. 25 (1993)......................................................................8, 9, 10

*Hope v. Warden York County Prison*,
  972 F.3d 310 (3d Cir. 2020) .................................................................8

*Hubbard v. Taylor* (*Hubbard* II),
   538 F.3d 229, 231 (3d Cir. 2008) ........................................................7

*Hudson v. Palmer*,
   468 U.S. 517 (1984)...........................................................................7

*Hutto v. Finney*,
   437 678, 682 (1978).........................................................................8

*Kevin v. Decker*,
   457 F. Supp. 3d 445 (D.N.J. 2020).....................................................23

*Martinez-Brooks v. Easter*,
   459 F. Supp. 3d 411 (D. Conn. 2020)..................................................24

*Mata v. Saiz*,
   427 F.3d 745 (10th Cir. 2005) ............................................................9

*Nicini v. Morra*,
   212 F.3d 798 (3d Cir. 200) ................................................................7

*Perkins v. Kan. Dep't of Corrections*,
   165 F.3d 803 (10th Cir. 1999) ...........................................................21

*Pinson v. Pacheco*,
   397 F. App'x. 488 (10th Cir. 2010) ....................................................23

*Roman v. Wolf*,
   977 F.3d 935 (9th Cir. 2020) .............................................................23

*Thakker v. Doll*,
   451 F.Supp.3d 358 (M.D. Pa. 2020)...................................................23

## Other Authorities

U.S. Const. amend, V, VIII, XIV.................................................*passim*

Federal Rule of Civil Procedure 23(a)(4) ................................................26

Federal Rule of Civil Procedure 23(b)(1) ................................................24

Federal Rule of Civil Procedure 23(b)(2) ................................................24

New Jersey Constitution Article I...................................................7, 26

iii

# INTRODUCTION

The majority of the inmates in the Cumberland County Jail are pretrial detainees, charged, but not guilty of, or sentenced for, any crime. The threat to these inmates from COVID-19 is real, immediate and ongoing. Their health and safety remain in jeopardy. Within the last 60 days alone both an officer and an inmate died from COVID-19. The threat at the jail is real and pressing.

Defendant admits that since the early days of the pandemic, he has been acutely aware of the highly contagious nature of COVID-19, and the significant enhanced risk of the spread of the virus in correctional facilities, including in his Jail. Defendant also admits that the common symptoms of COVID-19 are in many cases readily apparent—fever, chills, cough, shortness of breath, fatigue, body aches, headache and sore throat, and that mask wearing, sanitizing, proper cleaning, distancing, testing, and isolation and quarantining for infected and exposed individuals are the accepted, recognized means to stop the spread of the virus. Despite these admissions, Defendant has routinely refused testing for inmates obviously experiencing COVID-19 symptoms and has failed to implement policies to ensure that the inmates had access to these means to protect themselves in the face of the ongoing pandemic. Defendant's failure to take timely, necessary action has

been recklessly indifferent to the inmates' health and safety and constitutes a *per se* violation of the inmates' Constitutional rights.

The inmates are not alone in voicing concerns about Jail conditions. In an extraordinary alignment, the PBA Local 231 ("PBA 231"), the collective bargaining unit representing the correctional officers working in the Jail, for over a year has been asserting these very same claims in ongoing communications with the Jail and County, in Complaints filed in the State court and administrative agencies, against the Defendant, and his predecessor in that position.[1] Defendant's consistent, stunning response to both PBA 231 and to the inmates in this action who do not feel protected while housed in this Jail, who are frightened of exposure to this deadly virus, and who have become sick with the virus, has been to deny that any of their

---

[1] *See* P TRIAL 0002, January 29, 2021 Public Employees Occupational Safety and Health Complaint; *see* Dkt. No. 44-6 Certification of Karen A. Confoy ("Confoy Cert."). Ex. A, Second Amended Complaint CUM-L-250-20 dated August 26, 2020, alleging, *inter alia* that the Wardens "failed to develop effective policies and procedures to combat the threat of the pandemic, failed to order the equipment necessary to adequately protect … and allowed certain policies and procedures to stay in place that actually made employees… less safe."

concerns is valid and to attack the credibility of those sounding the alarm[2] -- all the

while seeking commendations for his performance.[3]

But Defendant cannot deny the facts – the enhanced risk is ongoing and

COVID-19 continues to surge in the Jail:

- We have been informed by a deceased inmate's family members that in late February or March, the inmate contracted COVID-19 at the Jail, and after his severe COVID-19 symptoms were not addressed by the Jail, he was finally taken to the hospital where he died in early April from COVID-19.

- On January 21, 2021, a correctional officer died of complications of COVID-19.

- In February, Kristina Smith, the CFG Health Services administrator for the Jail, reported 19 new inmate COVID-19 cases and 2 new staff cases, and from March 1 through March 11, 2021[4] reported 4 new inmate COVID-19 cases. This follows the 2020 year-end surge when 51 inmates, over 20% of the total inmate population (in addition to a number of correctional officers), were infected with the virus.

- In late February, we were informed by a family member of one of the Plaintiffs that the Jail was knowingly housing him and other inmates who were

---

[2] In opposing the Order to Show Cause, Defendant dismissively characterized Plaintiffs' detailed sworn statements describing the actual conditions of confinement as "inmate observations" and expressions of "general concerns" and argued that because the evidence offered by Plaintiffs consists primarily of the sworn statement of pretrial detainee inmates, such evidence must be given less weight than his statements: "Plaintiffs would have to show this court evidence far more solid than their own certifications…." Defendant's Brief in Opposition to Order to Show Cause
[3] *See id.* at 2, note 1; 14 and 17. Attacks on the PBA for its advocacy in favor of the rank and file correctional officers also began early in the pandemic, and is ongoing. *See* CumbJail007679-7685. Defendant has also produced numerous communications concerning the County's disputes with PBA 231, as well as the criminal records of Plaintiffs and inmate witnesses, none of which has any relevance to the claims asserted in this case.
[4] The last record provided was dated March 11, 2021.

3

negative for COVID-19 in cells with inmates who tested positive. Defendant disregarded several inmates' expressed complaints and requests to be removed from that situation. It was not until after we advised the Court during the initial hearing on February 24th that Defendant acknowledged this situation and the COVID positive inmates were isolated.[5]

- Defendant and his predecessor have misrepresented that they have provided inmates with masks, and the availability of masks. The prior Warden, the originally named defendant in this case, falsely certified that all inmates had been provided with N95 masks in April 2020.[6] In his February 11, 2021 Certification filed in this action, Defendant certified that as of April/May 2020, all inmates were supplied with a new surgical mask on a weekly basis, or sooner if soiled or torn, and that as of June 2020 "any inmate could get a mask on demand."[7] These statement are also untrue, as proven by the inmates' ongoing requests to be provided with masks, the evidence that they made makeshift masks out of t-shirts, the corroborating testimony of correctional officers, and the evidence that masks were only in the units as of February 2021.

- In responding to Plaintiffs' request for relief from this Court, Defendant falsely certified[8] that since the pandemic started, no inmate had ever submitted an administrative request form for anything related to COVID-19, including requests for masks or PPE, for cleaning materials or testing. Defendant later acknowledged receipt of a single request. In fact, as discovery has borne out, the inmates have submitted numerous requests,[9] and, with the exception of

---

[5] Defendant's counsel admitted during argument on the Order to Show Cause that allowing this situation to occur, was a clear violation of Jail policy. T. 2/24/2021 76:14-77:5.

[6] April 14, 2020 Certification of Richard T. Smith, 20cv12655(RMB) ("Smith Cert.") at ¶12 (CumbJail000700).

[7] February 11, 2021 Certification of Charles Warren 20cv7907(NLH) ("Warren 2/11/2021 Cert.") ¶¶19, 21. In fact, masks were not readily available and not on an "on request" basis until February 2021. ¶22; T. 2/24/2021 65:8-66:9.

[8] Warren 2/11/2021 Cert. ¶¶43-44, 58 (P TRIAL 324-335).

[9] Because inmates are not provided with an actual duplicate of the form when they submit a request, unless they hand write out a copy for themselves, there is no way to verify how many requests for masks, PPE, sanitizer, cleaning products, etc. to protect against COVID were actually submitted that were ignored or discarded.

requests for medical treatment and testing some of which were answered by the medical staff, the inmates' requests have been largely ignored.

- For months, Defendant accepted the nearly daily reports prepared and submitted by Kristina Smith to the County for the sole purpose of tracking COVID-19 in the Jail,[10] which stated that no inmates were positive for COVID-19, despite the fact that Defendant knew that the highly contagious virus spread through the correctional staff working in the Jail in close contact with the inmates, that the inmates were not being tested for the virus, and that symptomatic inmates requesting testing were routinely refused. Defendant's deliberate indifference to the health and safety of the inmates is exemplified by the inclusion of an "LOL" after one report of no positive cases in one of the reporting emails.[11]

Defendant's argument that his indifference should be excused, claiming to have relied heavily on CDC, federal, State, and County guidelines and internal policies, does not hold up. Not only does Defendant admit that he is not bound by CDC or federal guidelines in developing policy,[12] but none of the guidance Defendant cites supersedes his Constitutional obligations, and none gives him permission to turn a blind eye to the actual, known risks of the spread of the virus in the Jail. The fact is that Defendant did not have a COVID-19 policy until February 2021,[13] CFG did not have a COVID-19 testing policy,[14] Defendant did not implement policies or procedures to secure the well-being of the inmate population,

---

Plaintiffs have produced numerous "duplicate" forms to which they received no response. *See* P TRIAL 471-537.

[10] Smith 103:18-24.

[11] P TRIAL 112-113.

[12] Warren 9:16-10:23

[13] P TRIAL 124-129

[14] Smith 38:11-42:21.

did not communicate any guidance either to inmates or the correctional officers, did not provide the inmates with proper PPE or the means to protect themselves against the virus[15] and did not ensure that testing of symptomatic inmates was being conducted.

The evidence, unfortunately, substantiates the Court's expressed concerns about conditions in the Jail.[16] The world these inmates live in is one where Defendant demonstrates a reckless indifference to the inmates' grievances, has denied testing to inmates exposed to the virus or suffering symptoms, has housed inmates who are negative for COVID-19 with inmates who are suffering from the virus, and has failed to make sanitizer and adequate cleaning supplies and masks generally available to the inmates. None of this accomplishes any legitimate purpose, none furthers any legitimate governmental interest, and all demonstrates a violation of the inmates' constitutional rights.

---

[15] *See e.g.* Carter 89:24-90:6; 91:19-93:7; P TRIAL 215 (2/4/2021 Memo to inmates making it "Effective Immediately!!" that masks would be supplied to be worn at all times whenever an inmate was out of the cell or bunk area).
[16] T. 2/24/2021, 94:7-17.

## STATEMENT OF APPLICABLE LAW

## DEFENDANT'S ACTIONS AND INACTIONS CONSTITUTE A VIOLATION OF THE INMATES' DUE PROCESS AND EIGHTH AMENDMENT RIGHTS[17]

The government must "take reasonable measures to guarantee the safety of the inmates" under their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). Most of the inmates held in the Jail are pretrial detainees and, as such, are protected from being punished before they are adjudicated guilty. *Bell v. Wolfish*, 441 U.S. 520, 549 (1979); *Hubbard v. Taylor* (*Hubbard* II), 538 F.3d 229, 231 (3d Cir. 2008). Plaintiffs are also separately protected under the Due Process Clause from Defendant's deliberate indifference to their serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (citing *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 200)).

In deciding whether conditions of confinement constitute punishment, the courts will consider whether the condition complained of has a legitimate governmental objective, and whether the condition is reasonably related to that purpose. *Hubbard II,* 538 F.3d at 232, 236 (*citing Bell*, 441 U.S. at 538). As noted most recently by this District, courts must "consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period

---

[17] Defendant has also violated his obligation imposed by Article I, paragraph 12 of the New Jersey State Constitution ("Excessive bail shall not be required, excessive fines shall not be imposed, and cruel and unusual punishments shall not be inflicted.").

of time…." *Azcona v. Ellis*, Civ. No. 21-cv-8526 (FLW), 2021 WL 1139843, at *2 (D.N.J. Mar. 25, 2021) (citing *Hope v. Warden York County Prison*, 972 F.3d 310, 326 (3d Cir. 2020)) (further citations omitted). Once the Court determines that pretrial detainee inmates "are subjected to conditions unrelated to a legitimate governmental objective," the court "may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *Hope*, 972 F.3d at 326 (quoting *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal citations omitted).

Inmates at the Jail who have been sentenced are guaranteed constitutional protection under the Eighth Amendment from cruel and unusual punishment and conditions of incarceration that pose an unreasonable risk of harm. Inmates are entitled to relief under the Eighth Amendment when they have shown, *inter alia*, "the mingling of inmates with serious contagious diseases with other prison inmates." *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974). In *Helling v. McKinney*, 509 U.S. 25, 33 (1993), the Supreme Court recognized that the risk of contracting a communicable disease could constitute such an "unsafe, life-threatening condition":

> In *Hutto v. Finney*, 437 U.S. 678, 682 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of

> those exposed . . . . Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

"The question is not limited to whether the inmate's symptoms render a medical need sufficiently serious, but also extends to whether the potential harm to the inmate is sufficiently serious." *Chapman v. Federal Bureau of Prisons*, 291 F. Supp. 3d 1260, 1265 (D. Colo. 2018) (citing *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)). "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet has happened." *Helling*, 509 U.S. at 33 (quoting *DeShaney v. Winnebago Cty*, 489 U.S. 189 (1989)). Relief is available when a defendant, "knew of and disregarded an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. In such a case, Plaintiff is not required to show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. When such a showing is made, the claimant "'does not have to await consummation of the threatened injury to obtain preventive relief.'" *Id*. at 845. Pretrial detainees are entitled to no less protection.

In this case, Plaintiffs' serious risk of severe illness or death from COVID-19 is not illusionary; many in the Jail have contracted the virus, many have been sick

and some have died. Defendant has not, and cannot, articulate any legitimate reason for deliberately maintaining conditions within the Jail that deny all inmates even basic protections from exposure to COVID-19. Those conditions are unconstitutionally punitive and have led to confinement constituting cruel and unusual punishment. Thus, as the Court recognized in *Helling* and *Hutto,* the Constitution "require[s] a remedy" that ensures that protection of Plaintiffs' safety. *Helling*, 509 U.S. at 33.

## ARGUMENT

## POINT I

### THE EVIDENCE ESTABLISHES THAT PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF, INCLUDING APPOINTMENT OF AN INDEPENDENT MONITOR TO OVERSEE COMPLIANCE

There is no dispute that COVID-19 is a serious, deadly virus impacting every country in the world, and it is universally recognized that COVID-19 presents a significantly enhanced risk to individuals who are incarcerated. New COVID-19 variants as well as the original COVID-19 are now circulating rapidly in the United States, including in correctional facilities. According to the CDC the new variants (a) spread more rapidly, (b) have decreased susceptibility to therapeutic agents (i.e., it is less prone to treatment than the original COVID-19), (c) are more effective than the original strain of COVID at evading the body's natural defenses, and (d) can be either be milder or more severe than COVID-19.[18]

There is also no dispute, and it is also universally recognized, that the spread of COVID-19 may be contained by certain simple, but effective means—masks or other face coverings properly worn, hand washing and sanitizing, enhanced cleaning and sanitizing of all high touch surfaces and in high traffic areas, social distancing, quarantining, isolating exposed and infected individuals and testing. Defendant

---

[18] *See* Dkt. No. 44-6, Confoy Cert. Exs. O and P (Interim: Implications of the Emerging SARS-COV-2 Variant VOC 202012/01 (Center for Disease Control); Emerging Sars-COV-2 Variants (Center for Disease Control)); P TRIAL 0024-0042.

admits that since at least February 2020, he has been well aware of the dangers COVID-19 presents to the Jail's inmates. Defendant also has had specific, direct knowledge that COVID-19 was spreading amongst the correctional staff in the Jail no later than the first week of April 2020.[19] Yet, despite knowledge of the risks and the clear and present danger of the virus spreading to the inmate population, Defendant failed to implement and/or carry out necessary policies and procedures to prevent the spread, and failed to implement a legitimate testing protocol.

Defendant offers no evidence to explain why the Jail did not have a COVID-19 policy in place throughout the entirety of 2020, or why it took until February 2021 to institute any COVID-19 Policy (Pandemic Disease Containment Policy 11.12, dated February 1, 2021(2021 Policy)).[20] Nor did he, or could he, offer any evidence to establish how the 2021 Policy could be implemented. The 2021 Policy is a general "pandemic containment" policy which contains nothing specific about COVID-19, other than identifying it in a list of infectious diseases. The Policy, as written, provides no guidance directed to precautions that need to be taken in order to contain the spread of this deadly novel virus, or to respond to an individual

---

[19] *See e.g.* email dated April 8, 2020, from Meghan Sheppard, County Department of Health directed to him and the then Warden, in which Ms. Sheppard references the known "recent positives" in the Jail. P TRIAL 312.
[20] P TRIAL 124-129.

exhibiting COVID-19 symptoms, an individual with a known infection or an individual exposed to an infected individual.[21]

Officers of the PBA 231, representing the Cumberland Jail correctional officers, and correctional officers who have worked in the Jail throughout the pandemic confirmed that there has been no COVID-19 policy in effect until recently, and that they were unaware of even the existence of the 2021 Policy, such as it is, until at least mid-March. The Policy was not discussed with the correctional officers and the Jail has not provided any training on implementation of any COVID-19 Policy. *See e.g.* Carter 51:1-52:11; 53:1-54:20; 57:12-24; Bermudez 63;16-64:17; 65:4-10; Gross 10:5-10; 16:14-17:3; 29:6-19.

Defendant's reckless indifference to the need to implement a COVID-19 Policy has been at a significant price. On February 21, 2021 an inmate entered the Jail with a negative COVID-19 test. Within a few weeks he contracted COVID-19 in the Jail and became very ill. After being diagnosed, he was held in the Jail, despite worsening symptoms and despite calls to the Jail from the inmate's family members about his condition, until it was too late for effective medical treatment-he was intubated when he arrived at the hospital, and within the last two weeks that inmate

---

[21] This stands in stark contrast to the policies implemented in mid-2020 in other counties. *See* e.g. P TRIAL 0048-0066 (Passaic County Sheriff's Policies and Procedures Pandemic Preparedness Plan).

died.[22] How he contracted the virus within the Jail is unknown. The Jail has no written policy regarding testing inmates for COVID-19, so there is no way to identify or isolate asymptomatic inmates from the general population.[23] There is no policy directing correctional or medical staff how to respond to the spread of COVID-19 in the Jail amongst apparent asymptomatic inmates.[24] Moreover, the evidence will show, that even while claiming compliance with a testing protocol, inmates who requested testing because they were symptomatic or exposed to COVID were routinely refused testing for lack of "sufficient symptoms."[25]

Testimony and exhibits will establish that from the onset of the pandemic Defendant was indifferent to the need to use testing to determine the actual risk of the spread of COVID-19 through the Jail population. Defendant's conduct was directly at odds with governmental interests, and the public welfare. Defendant was satisfied with publishing the consistent daily reports the Jail submitted to the County, that there were no confirmed cases of COVID-19 amongst the inmate population in the Jail, (*see e.g.* P TRIAL385-460), and permitting the release of, at best, misleading

---

[22] Defendant has refused to produce this inmate's records, so this information is offered on information not yet in the record. On evidence of this, the failure to provide timely medical care constitutes reckless indifference, warranting Court intervention. *See Farmer*, 511 U.S. 834 (intentionally delaying medical care for a known injury constitutes deliberate indifference).

[23] Kristina Smith confirmed that the Jail's only testing policy concerned how a COVID-19 test is to be administered. Smith 40:24-42:21.

[24] *See* Smith 36:8-14; 38:11-14; 42:9-21.

[25] Warren 134:18-136:1.

information for months that the Jail had no confirmed cases of COVID-19.[26] *See* CumbJail 7684.

The grave effects of the lack of a COVID-19 policy also resulted in the decision to house COVID negative inmates with those infected with the virus. Despite numerous requests from inmates and their family members for Defendant to isolate the COVID patients, it was not until this matter was brought to the Court's attention that Defendant even acknowledged the situation.

Defendant's refusal to implement a COVID-19 policy was compounded by his refusal to respond both after receiving specific information about the early spread of the virus amongst the correctional staff in the Jail, and after receiving ongoing complaints over months from the inmates that they had been exposed to COVID or were symptomatic. At any time, Defendant could have required testing of all inmates in response to either the spread of the virus through the non-inmate population in the Jail or in response to the overwhelming number of inmates requesting testing as a result of an exposure or experiencing symptoms, but he chose not ever to do so.[27] Defendant produced no evidence that he considered implementing enhanced

---

[26] For example, on May 5, 2020 the County spokesperson for the Jail advised a reporter that "As of the writing of this email, there are no inmates at the County Jail testing positive for COVID-19."

[27] Smith 32:15-36:10.

precautions to protect the inmates, or that he ever tasked Kristina Smith or CFG with developing and implementing a testing plan to determine the spread.

Due to the lack of testing, there has been no way to track (or thus contain) the spread of the virus through the inmate population, and the failure of this lax testing approach is overwhelming. In late October, Defendant, for the first and only time required large scale testing of the inmates. Defendant admits that the testing was not conducted out of any interest in tracking the spread of the virus within the Jail, but because testing was required under the New Jersey Supreme Court Order in connection with the Jail's proposed inmate transfer.[28] The testing, conducted in late October and early November disclosed a devastating reality -- 51 inmates and several correctional officers were positive for the virus.[29]

Similarly, given that it is universally accepted that wearing a mask, particularly when in close contact with others, significantly reduces the spread of the virus, Defendant's refusal to implement a mask policy for inmates cannot be justified. Defendant, implicitly appears to concede as much, as both he and his predecessor have attempted to cover up their actions and falsely certified that the inmates have been provided with, and have had access to a supply of masks for

---

[28] Warren 138:16-140:18; P TRIAL 324-335 (Warren 2/11/2021 Certification) ¶46.
[29] Warren 153:5-158:4.

16

months.[30] The Jail has no policy concerning inmate masking. There is no policy mandating the type of mask to be distributed to inmates, how masks will be distributed, the frequency of distribution or manner in which masks will be made available to inmates or requiring masks to be worn at all times in all common areas. As a consequence masks have not been used and this can reasonably be presumed to have been a significant contributing factor to the spread of the virus.

The evidence establishes that for the first several months of the pandemic, inmates were issued one single use surgical mask every few weeks or month. Inmates used their t-shirts wrapped around their heads for protection against transmission of the virus. Starting in or about November 2020 and until February 2021, after the Amended Complaint was filed, inmates were issued one surgical (single use) mask every few weeks, regardless of their level of activity or the condition of the mask. Inmates were provided a new mask on a more frequent basis only if they were leaving the unit or being transported off site. For the first time, in February 2021, the units in the inmate housing areas were supplied with blue surgical masks available to the inmates upon request made to the correctional officer in the

---

[30] *See* Smith Cert. at ¶12 (CumbJail000700) in which the prior Warden, the original named defendant in this case, certified to this Court that as of April 2020, every inmate had been issued an N95 mask; Warren 2/11/2021 Cert. stating that masks were, and had been available to the inmates "on demand." Furthermore, discovery has established that inmates' written requests to be provided with masks to be protected from continuing exposure to COVID-19 have been routinely ignored.

unit.[31] Defendant's failure for nearly a year to implement a mask policy or to take any action to ensure that inmates had masks and wore them combined with his misrepresentations about the prison and use of masks demonstrates the need for Court intervention.

Despite requiring inmates to clean their cells and the common areas, Defendant did not implement any policy to ensure that the inmates have either adequate supplies to properly clean and sanitize or the proper protective gear, such as gloves to use while cleaning.[32] Inmates have affirmatively been denied access to these supplies.[33] It is not uncommon for empty containers to remain unfilled for days despite requests for supplies from the inmates.[34] The evidence has shown that the lack of cleaning supplies is a severe problem and that the Jail falls far behind other

---

[31] In contrast to the lack of attention given to mask protection for the inmates, Defendant produced numerous communications dated from early 2020 through March 2021 with the PBA, the County and Jail staff, including memos from the Warden to the PBA and/or staff, and emails between and amongst Defendant and PBA officers, concerning the availability of masks for correctional officers and other staff, requirements for wearing masks and numerous rule changes about what type of masks correctional officers would be permitted to use.

[32] *See* Carter 108:21-109:1; 111:3-16.

[33] *See* P TRIAL 846-851 at ¶ 25; P TRIAL 751-756 at ¶ 25; P TRIAL 623-629 at ¶ 27; P TRIAL 776-781 at ¶ 23; P TRIAL 745-750 at ¶ 24.

[34] *See* Carter 109:25-111:2; 139:6-21; Gross 20:10-22:3; 87:22-91:16; Bermudez 193:2-11; 290:5-293:4.

18

County Jails in maintaining cleaning levels and providing inmates with necessary products. Bermudez 206:18-207:20; 285:8-289:16.[35]

Defendant does not dispute that sanitizer should be available to the inmates, as an essential means to combat the spread of COVID-19, and cannot therefore suggest that there is any legitimate governmental policy for refusing access. Yet, both the inmates and correctional officers will testify not only that sanitizer has not been provided, but that inmates were told that they were not to use the available sanitizer which was for the officer's use only, and that frequently, the containers that could hold a supply are empty. *See e.g.* Gross 22:9-1785:10-87:21.

While it is Defendant's obligation to ensure adequate protections, Plaintiffs and other inmates have been proactive in identifying where these are lacking. Defendant admits that the Jail has a policy to provide inmates with request forms and that it is Jail policy that the inmates' requests be answered on the form and returned to them. Yet again however, Defendant is mouthing the words of policy, but refusing to act to implement. The inmates, as witnessed by correctional officers, submitted numerous Administrative Request Forms,[36] seeking PPE, cleaning

---

[35] Inmates were also not protected in their cells or units. Inmates in cell units share vents with the cell units used to house COVID-19 infected inmates, creating a needless additional risk to inmates that the virus could travel through the vents and infect even more inmates. P TRIAL 776-781 at ¶ 21.

[36] Because the Forms provided by the Jail are not duplicate or carbon forms, inmates are not able to keep a copy of what they submit. The Administrative Remedy Form

supplies, quarantining and testing. With the exception of some requests for medical treatment and testing answered by the medical staff,[37] the inmates' requests have been largely ignored and many answers that are provided are not actually responsive to the request made.[38] For example, responses to requests for testing generally state some version of the response, "per CDC/NJDOH guidelines, testing is only done on exposure to confirmed positive and symptomatic patient" without regard to the individual circumstances presented by the inmate. There is no evidence that the reasons underlying the inmates' individual request were ever seriously pursued.

More than simply a failure to respond to inmate inquiries, Defendant's failure to respond again demonstrates Defendant's consistent failure to practice his own Jail policy. Again, the malfeasance is demonstrated by Defendant attempts to cover up what has been occurring by denying under oath that the Jail ever received any request

---

is a single form, without carbon copy, which, after being completed, is left in a box on a Correctional Officer's desk. As Plaintiffs and other inmate witnesses have certified in prior submission and will testify during the hearing, while some inmates complete a second form to keep as their record, unless the form is returned to the inmate with the disposition written on it, the inmates have no way to confirm that the request form submitted was ever addressed or even retained.

[37] Defendant's and CFG's production of their records of responses to inmates COVID-19 medical/testing related requests is telling. CFG's production does not contain any medical grievance responses for August-October 2020, or since the end of December 2020. There are 17 grievance responses in May; 5 in June; 3 in July; 3 in November; 4 in December (CFG00776-810). Defendant's production is largely duplicative of CFG's (CumbJail 005917-6016). *See e.g.* P TRIAL 461-470. Notably, Plaintiffs have produced numerous hand written "duplicates" of requests they submitted that have gone unanswered. *See e.g.* P TRIAL 471-537.

[38] *See e.g.* P TRIAL 471-537.

from any inmate for a mask, cleaning supplies, or information about COVID-19 exposures, precautions or testing. P TRIAL at ¶¶ 43-44. As this case proceeded, Defendant was forced to admit that denial was false.[39] From Defendant's significant, repeated, demonstrated refusal to address inquiries requesting potentially life-saving equipment and supplies and testing, the Court may infer that the purpose of his inaction was unconstitutional.[40] Defendant's disregard has created punitive conditions of confinement and an excessive risk to the health and safety of Plaintiffs and all inmates in the Jail. *See, e.g.*, *Farmer*, 511 U.S. at 834; *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 809 (10th Cir. 1999).

---

[39] Despite the fact that the Court observed during the initial hearing that the Warden's statement that no requests had been submitted seemed incredible, Defendant was not forthcoming about the records in his possession. It took numerous requests from Plaintiffs for production of the Jail's records of inmate requests, and, it was not until after CFG, in response to a subpoena, produced copies of Inmate Administrative Request Forms which CFG had answered, and after Plaintiff had demanded that Defendant confirm that the Jail had no Administrative Remedy Forms, because none had been produced by Defendant, that the Defendant finally produced copies of Administrative Remedy Forms from its files.

[40] This case is wholly distinct from other cases involving a failure to respond to isolated inmate inquiries which in and of itself may not rise to the level of a due process violation. *See Azcona*, 2021 WL 1139843, at *3. Here, the significant, repeated, demonstrated refusal to respond to inquiries requesting potentially life-saving equipment and supplies constitutes an unreasonable denial of those requests in the midst of a worldwide pandemic.

## POINT II

## DEFENDANT CANNOT RELY ON CDC TESTING GUIDELINES TO JUSTIFY THE JAIL'S FAILURE TO DETECT COVID-19 IN THE JAIL BECAUSE SYMPTOMATIC INMATES WERE ROUTINELY DENIED TESTING

At the core of Defendant's defense is his claim that he followed the CDC testing guidelines and, consistent with those guidelines only tested inmates with symptoms of COVID-19. Defendant admits that he was not bound by those guidelines in developing policy,[41] but even if he were, the Jail did not adhere to those guidelines. As inmates and correctional officers will testify, throughout the pandemic, the Jail routinely and regularly denied testing to inmates obviously suffering from one or more of the many possible COVID-19 symptoms on the grounds that the inmate did not meet the requirements for testing.[42] Whatever policy Defendant claims was in place does not matter -- the fact is that in practice that policy was not actually practiced.

Moreover, while the CDC guidelines are ubiquitous in discussion about COVID-19, they are non-binding guidance and their existence does not justify Defendant's failures and his indifference to the health and safety of the inmates. The CDC guidelines are framed in terms of feasibility, making suggestions while recognizing what might be possible for one situation may not be workable in another

---

[41] Warren 9:16-21.
[42] *See e.g.* Bermudez 221:3-13.

22

situation. As explained in the CDC guidance itself: "The guidance may need to be adapted based on individual facilities' physical space, staffing, population and other resources and conditions." Defendant did not produce any evidence that he ever gave any consideration to implementing regular, universal COVID testing for inmates or an enhanced testing protocol for asymptomatic individuals in response to the actual conditions playing out in the Jail.

As recognized by the courts, the high rate of infection in the Jail and recent deaths associated with the virus establish that the serious injury alleged by Plaintiffs is not mere speculation but "is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Pinson v. Pacheco*, 397 F. App'x. 488, 491 (10th Cir. 2010). It is essential that correctional facilities implement measure to prevent the spread of COVID-19 sufficient to protect inmates from the deadly virus. By failing to do so, Defendant abdicated his constitutional obligations. *See Cristian A.R. v. Decker*, 453 F. Supp. 3d 670, 687 (D.N.J. 2020); *Kevin v. Decker*, 457 F. Supp. 3d 445, 459 (D.N.J. 2020); *Desmond v. Becker*, 477 F. Supp. 3d 357 (D.N.J. 2020); s*ee also Thakker v. Doll*, 451 F. Supp. 3d 358, 370 (M.D. Pa. 2020)( "The precautions being adopted to stop it should apply equally, if not more so, to the most vulnerable among us."); *Roman v. Wolf*, 977 F.3d 935, 944 (9th Cir. 2020) ("The district court also correctly concluded that Plaintiffs were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate.");

*Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 447 (D. Conn. 2020) ("Courts across the country have concluded that the risk of contracting COVID-19 as a result of unsafe conditions of confinement constitutes irreparable harm.") (citations omitted).

**POINT III**

**A CLASS ACTION SHOULD BE CERTIFIED**

Plaintiffs brought this action pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2), as a class consisting of all persons confined or to be confined in Jail, including as subclasses: (i) persons confined pre-trials, and (ii) persons confined pursuant to a judgment of conviction. Plaintiffs meet all of the requirements to proceed as a class and for relief to be granted in favor of the class.[43]

Because all inmates in the Jail face the same or similar exposure, are all denied the means to take reasonable precautions against the spread of the virus and receive the same lack of treatment and care, and all suffer from substantially the same effects of COVID-19 exposure, a class action is both the proper means of proceeding and most judicially efficient. All members of the Class seek the same relief—an

---

[43] Plaintiffs recognize that inmates in the Jail may have individual claims arising out of their individual circumstances and particular injuries suffered as a consequence of Defendant's actions or inactions, as to which they seek damages. Resolution of individual claims and facts giving rise to such claims is not necessary for relief to be awarded on behalf of the proposed class. *See Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 57-58 (3d Cir. 1994)

injunction addressing the failures in COVID-19 testing, protection, procedures (quarantine and isolation), and a neutral monitor to investigate Jail conditions and to report and recommend to the Court what steps can and should be taken immediately at the Jail to get control of the spread of COVID-19.

Numerosity: The class is so numerous that joinder is impracticable. Based upon information and belief, the size of the class is approximately 230 people and is therefore so numerous that joinder is inherently impracticable for that reason alone. Joinder is also inherently impracticable. Because Plaintiffs are housed in the Jail which intakes newly charged individuals processed through the State and County court system, the class includes unnamed, future class members who cannot by definition be joined at this time. Further, proposed class members are highly unlikely to file individual suits on their own, as all are incarcerated and many are indigent, and thus have limited access to their retained or court-appointed counsel and could fear retaliation from filing suits against Defendants, and lack access and financial resources to obtain qualified Counsel to bring such suits.

Commonality: The claims of the class share common issues of fact and laws. All inmates are subject to the same injury as a result of Defendant's failure to implement and/or enforce policies regarding health and hygiene to mitigate and respond to the spread of COVID-19 in the Jail. The actions and inactions of Defendant in responding to the COVID-19 pandemic systemically affect all

proposed class members and violate the rights of all of the inmates housed in the Jail under the Fifth, Fourteenth and Eighth Amendments to the United States Constitution, as well as Article I of the New Jersey Constitution. Plaintiffs seek injunctive relief and ongoing monitoring of within the Jail that will benefit all inmates.

Typicality: The claims of Plaintiffs are typical of those of the class as a whole, because each Plaintiff is currently in Defendant's custody and Plaintiffs' claims arise from the same policies and procedures (or lack thereof) that provide the basis for all proposed class members claims.

Adequacy: Named Plaintiffs and witness Carlos Soler are adequate class representatives who meet all of the requirements of Rule 23(a)(4). They have no conflicts of interest in this case with other class members. They will fairly and adequately represent the interest of the class, and each understands the responsibilities of a representative moving forward. Plaintiffs will vigorously prosecute the interests of the class.

## CONCLUSION

The consequences of contracting COVID-19 are severe, in many cases causing serious illness and death. Even for those who do not become seriously ill, it is well reported that individuals who contract the virus may nonetheless suffer from many lingering, serious effects, including heart and lung damage, and other long

26

term, "long haul" symptoms including shortness of breath, difficulty with thinking, a lingering cough and depression. Despite admitting knowledge of the seriousness of the virus and the significant risk of the spread of the infection in the Jail, Defendant failed to take reasonable measures to contain the spread.

It is only recently, on the eve of the Court's hearing on Plaintiffs' request for injunctive relief that Defendant has taken any effective steps to enforce measures to contain the spread of COVID-19 in the Jail. The Jail's COVID-19 Policy is dated February 1, 2021, but was not circulated to the PBA or correctional officers to implement until mid-March. Masks are only recently available. Testing is occurring more frequently and continues to identify a high number of cases. Recently issued memos are the first directing that certain specific measures be enforced amongst the inmate population to address COVID-19 in the Jail. While Plaintiffs acknowledge these measures, given the Defendant's history of indifference there is no reason to believe that once his conduct is no longer being scrutinized conditions will not again deteriorate for the inmates in his Jail.

Plaintiffs have established that Defendant has direct and specific knowledge of the serious risk of COVID-19 and the means to contain the spread. Defendant's failure to implement policy designed to contain the spread and protect the inmates from a known and demonstrated risk of becoming infected with the virus in his Jail and his refusal to test inmates for COVID-19 despite visible symptoms and known

exposure not reasonably related to any legitimate purpose. Plaintiffs and all inmates are entitled to an award of the injunctive relief sought.

Respectfully submitted,

Date: April 19, 2021

*/s/ Karen A. Confoy*

Karen A. Confoy
Jeffrey M. Pollock
Paul W. Kalish
**FOX ROTHSCHILD LLP**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
kconfoy@foxrothschild.com
jmpollock@foxrothschild.com
pkalish@foxrothschild.com
(609) 844-3033
*Attorneys for Plaintiffs Raymond Lamar Brown, John Clark, Desmond Rodgers and Todd Ford, Jr. And others Similarly Situated at the Cumberland County Jail*