William J. Hughes, Jr., Esq. (NJ 3031993)
PORZIO BROMBERG & NEWMAN, P.C.
100 Southgate Parkway
Morristown, NJ  07962
(973) 889-4308
wjhughes@pbnlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAYMOND LAMAR BROWN, JOHN CLARK, DESMOND ROGERS, TODD FORD, JR., AND CARLOS SOLER, individually and on behalf of others similarly situated, | : : : : : | Hon. Noel L. Hillman |
| Plaintiffs | : | |
| | | Case No. 1:20-cv-7907-NLH-KMW |
| v. | : | |
| CHARLES, WARREN, in his Official capacity as Warden, Cumberland County Dep't. of Corrections and CUMBERLAND COUNTY NEW JERSEY, | : : : : | **PARTIAL INITIAL REPORT AND RECOMMENDATION OF THE SPECIAL MASTER** |
| Defendants. | : | |

On May 13, 2021, the Court entered a "Consent Order for the Appointment of a Federal Rule 53 Master and Other Relief."[1] This Consent Order required appointment of a Master pursuant to Fed. R. Civ. P. 53.[2] Under this rule, the appointing order must state, among other things, "the master's duties, including investigation or enforcement duties, and any limits on the master's authority under Rule 53(c)."[3] In accordance with this provision of the rule the Consent Order provided:

---

[1] See, ECF No. 126.
[2] *Id*., at ¶ 3, page 4.
[3] Fed. R. Civ. P. 53(b)(2)(A).

> Within forty-five (45) days from the appointment of
> the Master, the Master shall file a report to the
> parties and Court containing findings and
> recommendations ("Initial Report") regarding the
> adequacy of COVID-19 protections and procedures at the
> Cumberland County Jail. Subject to further agreement
> of the parties as may be Ordered by the Court, the
> Master shall consider and file its Initial Report
> about COVID-19 testing, COVID-19 contact tracing of
> all Jail inmates and staff, quarantining and isolation
> practices, including ventilation of designated
> isolation and quarantine areas, the availability and
> sufficiency of hand sanitizer, masks and other
> personal protective equipment, and cleaning supplies,
> social distancing measures and recreation, and any
> other issues related to COVID-19 affecting the inmate
> population, as such may be identified by the Master.[4]

The Court appointed me as the Master in accordance with the

Consent Order and the Rule by Orders dated May 17 and May 21,

2021.[5]

The settlement in this matter came on the tenth day of a

preliminary injunction evidentiary hearing. Both parties had

called numerous witnesses, and the hearing transcripts span over

2,000 pages.  These transcripts have been provided to me, and I

have reviewed them in their entirety.

Additionally, I conducted an announced inspection of the

Cumberland County Jail on June 4, 2021.  Present at this

inspection were counsel for the plaintiffs and the defendants.

Finally, on June 10, 2021, the Cumberland County Jail responded

---

[4] ECF No. 126, at ¶ 6, pages 4-5.
[5] ECF Nos. 131 and 139.

to my information requests, producing both narrative answers and 2,953 pages of documents in response to my requests.

This Partial Initial Report and Recommendation principally addresses a single issue: the segregating, isolating and quarantining of inmates who: 1) are suspected of having COVID-19; 2) have been exposed to individuals who have had COVID-19; and, 3) test positive for COVID-19.

The testimony of various individuals during the evidentiary hearing concerning the practices of the Cumberland County Jail ("CCJ") raised a concerning issue that there were at least two somewhat recent circumstances where inmates who had tested positive for COVID-19 had been quarantined in cells with inmates who had tested negative.  Additionally, there was testimony from CCJ officials, as well as from a representative of CCJ's healthcare provider, CFG Health Systems, LLC ("CFG"), that federal law in the form of the Health Insurance Portability and Accountability Act[6] (hereinafter "HIPAA"), restricted CCJ's ability to disclose and use inmates' Protected Health Information ("PHI").  Although no testimony outright said that HIPAA's mandatory requirements prevented CCJ from implementing more effective and common-sense measures to prevent the further spread of COVID-19 among inmates, corrections officers and

---

[6] Pub. L. 104-191, 110 Stat. 1936 (August 21, 1996).

3

staff, this is the logical implication from the testimony taken as a whole.  CCJ and CFG misunderstand the breadth of, and the exceptions to, HIPAA's regulations as they relate to the protection of PHI.

Accordingly, I feel it is paramount to address this issue immediately so that CCJ and CFG can take prompt measures to better ensure that inmates who are COVID-19 positive, COVID-19 negative and who have been exposed to COVID-19 are not quarantined or isolated together.  For this reason, I have prepared and filed this Partial Initial Report and Recommendation.  As a secondary matter, the regulatory analysis contained herein will serve as a foundation for future recommendations.

A.   **Testimony During the Evidentiary Hearing**

    1.   Testimony on Quarantining and Isolating Inmates who have Tested Positive for COVID-19 with Inmates who Tested Negative for COVID-19 and/or Suspected of Being Exposed to COVID-19.

There was a significant amount of testimony during the trial that there were at least two instances at CCJ where inmates who had tested positive for COVID-19 were placed in cells with individuals who had tested negative.  For instance, plaintiff Carlos Soler testified that on or about February 14, 2021, he was placed in the segregation unit (A Pod) after having

been exposed to individuals who had COVID-19.[7]  Although Mr.

Soler tested negative, he was placed into a cell with an

individual who tested positive.[8]  Mr. Soler identified three

other inmates who had tested positive for COVID-19 and had been

placed into cells with inmates who had tested negative, all at

the same time.[9]  Plaintiff John Clark testified that, also in

February 2021, he tested negative for COVID-19, but he was

isolated in A-Pod with a COVID-19 positive inmate.[10]

CCJ concedes two instances where COVID-19 positive and

negative inmates were placed in cells together and "were not

properly transferred out of those cells in a reasonable amount

of time. . . ."[11]  Nevertheless, CCJ insists that these were two

isolated incidents, caused by miscommunication, and were not a

result of deliberate indifference.[12]  The defendants disagree as

to the number of incidents, pointing to the trial testimony from

the witnesses that there were several occasions where COVID-19

positive and negative inmates were placed in cells together, and

the Court recalled the testimony similarly.[13]

Whether it was two, four, or more incidents where COVID-19

positive and negative inmates were placed together is

---

[7] Tr. 657:2-657:21 (April 22, 2021).
[8] *Id.*
[9] Tr. 657:23 – 660:15 (April 22, 2021).
[10] Tr. 383:4 – 384:12 (April 21, 2021).
[11] Tr. 825:18 – 826:1 (April 26, 2021).
[12] Tr. 826:3 – 826:20 (April 26, 2021).
[13] Tr. 827:14 – 828:21 (April 26, 2021).

5

irrelevant.  As the Court pointed out, the trial testimony was clear that the incidents about which there was testimony occurred about two months prior to the evidentiary hearing – nearly one year into the pandemic.  As the Court pointed out:

> And what's so telling, one of the witnesses said,
> really, after a year, is that the kind of mistake that
> you make after a year of a pandemic, to co-house a
> positive inmate with a negative inmate, one or more?
> How difficult is it to have a protocol that says when
> someone is positive, they either go with another
> positive or they go into their own cell?[14]

Warden Charles Warden testified that it became CCJ's *practice* to place inmates who tested positive for COVID-19 in A Pod.[15]  This appears to be part of the problem: CCJ did not – and still does not – have a clear policy specifically addressing the measures of how CCJ's management, staff and inmates are required to prevent COVID-19 and manage those individuals who are, or are suspected of having, COVID-19.  CFG's former Health Services Administrator, Kristina Smith, testified that an exhibit[16] which had a section heading entitled "Policy" was a not actually a policy, but rather a "guideline put into place for managing a patient who we thought was symptomatic of COVID-19."[17]

I should note that CCJ's response to the Master's Initial Requests contains Policy No. 11.12, entitled "Pandemic Disease

---

[14] Tr. 828:22 – 829:2 (April 26, 2021).
[15] Tr. 894:3 – 894:13 (April 26, 2021).
[16] Defendant's Exhibit 67, at pages 143-144.
[17] Tr. 1275:12 – 1276:8 (April 29, 2021).

6448584

Containment." [18]  This policy, effective February 1, 2021, is an updated version of a broader policy relating to pandemics.[19]  The policy is very broad, as most policies necessarily are, and do not contain the specifics on what must be done to contain COVID-19 infection, when it must be done, and by whom.  The vagueness of the policy is understandable: none of us have lived through a pandemic, and the creation of a policy must necessarily contemplate many potential scenarios and provide enough leeway to make procedural adjustments under specific circumstances.  COVID-19, however, is no longer a potential scenario; it is reality.  It is apparent that the policy, even as amended, fails to address many of the required protective measures that we now accept as necessary: cleaning, sanitizing, masking, testing, and contact tracing.  Although a general pandemic policy is necessary, it is clear the unique challenges of COVID-19 require its own policy or sub-policy that address these specific challenges.

To be sure, our June 3, 2021 inspection of CCJ revealed that there are currently no positive cases of COVID-19 in the facility, and it appears that there have been none for nearly two months.  The fact that CCJ does not currently engage in mandatory periodic universal testing of all inmates and staff

---

[18] CCJ Document Response 001306 – 001311.
[19] Tr. 1073:10 – 1073:24 (April 27, 2021).

6448584

does not appear to be a factor.  The most recent studies suggest that about 20% of all individuals infected with COVID-19 will be asymptomatic.[20] Accordingly, if there were numerous individuals who have become infected with COVID-19 in the past two months, the chances are that 80% of those infected would have presented with some symptoms, and thus gain the attention of CFG and CCJ.

Notwithstanding these most welcome developments at CCJ, the fact remains that COVID-19 was, and still is, a major health crisis of an international magnitude. Even though the cases at CCJ – and in New Jersey – have dropped precipitously, there is no guarantee that the low infection rates will remain so.  Some studies suggest that even though immunity (either through prior infection or vaccination) may result in less-severe illnesses in cases of COVID-19 reinfection, emerging variants may still pose a serious threat even to those who are believed to be immune.[21] Indeed, our inspection of the CCJ facility revealed that, at that time, only about 25% of the inmates and less than 30% of the staff have been vaccinated.  Moreover, the inspection revealed some areas of the facility where inmates were in

---

[20] *See, e.g.,* Oyungerel Byambasuren, MD, Magnolia Cardona, PhD, Katy Bell, PhD, Justin Clark, BA, Mary-Louise McLaws, PhD, Paul Glasziou, PhD, "Estimating the extent of asymptomatic COVID-19 and its potential for community transmission: Systematic review and meta-analysis", Journal of the Association of Medical Microbiology and Infectious Disease Canada, https://doi.org/10.3138/jammi-2020-0030 (December 11, 2020).

[21] *See, e.g.,* Jennie S. Lavine, Ottar N. Bjornstad, Rustom Antia, "Immunological characteristics govern the transition of COVID-19 to endemicity", Science, Vol. 371, Issue 6530, pp 741-45, https://science.sciencemag.org/content/371/6530/741 (February 12, 2021).

6448584

crowded dormitories with few inmates wearing masks, or wearing them correctly, even though they were available. Accordingly, COVID-19 remains a real threat to CCJ and the need for establishing a comprehensive and written COVID-19 policy for implementation today and in the future is both clear and paramount.

In order to begin to develop such a specific policy, the stakeholders (CCJ, CFG and their constituents) must have a clear understanding of the parameters of the regulatory landscape under which any policy is to be developed and implemented.  For the issue at which this Partial Interim Report and Recommendation is directed – the identification and quarantining of those who are, or under investigation of being, infected with COVID-19 – it appears that there is confusion concerning who must comply with HIPAA, the circumstances under which PHI may be shared, and how PHI may be used.

2.   Testimony on HIPAA.

Throughout the trial testimony, there was a general misconception that HIPAA prevented the disclosure and use of an inmate's COVID-19 status except under limited circumstances.  As CFG's Kristina Smith testified, she instructed correctional officers to "not talk about [an inmate's] condition to anybody unless it was pertinent to the safety and security of the

6448584

facility due to HIPAA violations."[22]  Megan Sheppard, the Health

Officer for the Cumberland County Department of Health,

testified that CCJ would violate HIPAA if a correctional officer

were to ask an inmate if he or she had a medical excuse to

refrain from wearing a mask.[23]  Warden Charles Warden, who

assumed the duty of conducting contact tracing for correctional

officers, testified that he didn't keep any notes because "I

don't want to violate HIPAA rights."[24]  Each of these statements

reflects a fundamental misunderstanding of who is required to

comply with HIPAA, under what circumstances PHI may be

disclosed, and how that information may be used.

     Without question, HIPAA is a complicated, and often

confusing, regulatory scheme.  Combined with various other State

and federal requirements mandating the protection of an

individual's personal identifying information and data, it is

quite understandable that those entrusted with this information

would take an overly conservative approach, especially

considering the consequences and potential liability for even

inadvertent breaches.  But "HIPAA does not create a private

right of action for alleged disclosures of confidential medical

---

[22] Tr. 1270:9 – 1270:21 (April 29, 2021).
[23] Tr. 2090:13 – 2091:2 (May 4, 2021).
[24] Tr. 1066:23 – 1067:3 (April 27, 2021).

6448584

information. . . ."[25]  Moreover, contained within the regulations
themselves are provisions specifically designed for correctional
institutions, and those provisions have already been tested in
interpretive caselaw.  An analysis of the regulations and the
case law reveals that CCJ has multiple options to create and
implement an effective COVID-19 identification and segregation
policy without violating HIPAA.

B.   **HIPAA ANALYSIS**

     1. HIPAA Regulatory Scheme and Correctional Institutions

     The starting point for this analysis is the proposition
that there is no blanket prohibition against the use and
disclosure of PHI by covered entities.  Indeed, a blanket
prohibition would make no sense in a practical sense, and the
regulations take this into account.  Covered entities are
permitted to use and disclose PHI in a variety of circumstances:

     (1) *Covered entities: Permitted uses and disclosures.*
     A covered entity is permitted to use or disclose
     protected health information as follows:

          (i) To the individual;

          (ii) For treatment, payment, or **health care
          operations**, as permitted by and in compliance
          with §164.506;

          (iii) **Incident to a use or disclosure otherwise
          permitted or required by this subpart**, provided
          that the covered entity has complied with the

---

[25] *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 n.4 (10th Cir. 2010); *see also
Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451 (3d Cir. 2013); *Acara v.
Banks*, 470 F.3d 569, 571 (5th Cir. 2006).

6448584

applicable requirements of §§164.502(b), 164.514(d), and 164.530(c) with respect to such otherwise permitted or required use or disclosure;

(iv) Except for uses and disclosures prohibited under §164.502(a)(5)(i), pursuant to and in compliance with a valid authorization under §164.508;

(v) Pursuant to an agreement under, or as otherwise permitted by, §164.510; and

(vi) **As permitted by and in compliance with this section, §164.512**, §164.514(e), (f), or (g).[26]

Although the HIPAA regulations set forth in detail circumstances in which PHI may be used and disclosed with the consent of the individual[27] and with notice to the individual allowing her/him the opportunity to object[28], there are also provisions in the regulations in which neither consent nor notice is required.[29]  For instance, a covered entity may, without the consent of or notice to the individual, use and disclose PHI to a "public health authority that is authorized by law to collect or receive such information for the purpose of preventing or controlling disease, injury, or disability, including, but not limited to, the reporting of disease, injury, vital events such as birth or death, and the conduct of public health surveillance, public health investigations, and public

---

[26] 45 C.F.R. § 164.502(a)(1) (emphasis added).
[27] 45 C.F.R. § 164.508.
[28] 45 C.F.R. § 164.510.
[29] 45 C.F.R. § 164.512.

6448584

health interventions. . . ."[30]  Additionally, a covered entity

may, without consent of or notice to the individual, use and

disclose PHI in response to a court order.[31]

Of particular relevance to this case are the provisions in

the HIPAA regulations specifically addressing the use and

disclose of PHI to correctional institutions by covered

entities.  Under the regulations, a "Correctional institution"

is defined as:

> *Correctional institution* means any penal or
> correctional facility, jail, reformatory, detention
> center, work farm, halfway house, or residential
> community program center operated by, or under
> contract to, the United States, a State, a territory,
> a political subdivision of a State or territory, or an
> Indian tribe, for the confinement or rehabilitation of
> persons charged with or convicted of a criminal
> offense or other persons held in lawful custody. Other
> persons held in lawful custody includes juvenile
> offenders adjudicated delinquent, aliens detained
> awaiting deportation, persons committed to mental
> institutions through the criminal justice system,
> witnesses, or others awaiting charges or trial.[32]

The regulations specifically allow for covered entities to

provide PHI to correctional institutions **for any purpose** for

which the PHI is disclosed:

> (5) *Correctional institutions and other law
> enforcement custodial situations*—
>
> > (i) Permitted disclosures. A covered entity may
> > disclose to a correctional institution or a law
> > enforcement official having lawful custody of an
> > inmate or other individual protected health

[30] 45 C.F.R. § 164.512(b)(1)(i).
[31] 45 C.F.R. § 164.512.(e)(1)(i) and (f)(1)(ii).
[32] 45 C.F.R. § 164.501.

6448584

information about such inmate or individual, if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

> (A) The provision of health care to such individuals;
>
> (B) The health and safety of such individual or other inmates;
>
> (C) The health and safety of the officers or employees of or others at the correctional institution;
>
> (D) The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;
>
> (E) Law enforcement on the premises of the correctional institution; or
>
> (F) The administration and maintenance of the safety, security, and good order of the correctional institution.

(ii) Permitted uses. A covered entity that is a correctional institution may use protected health information of individuals who are inmates for any purpose for which such protected health information may be disclosed.

(iii) No application after release. For the purposes of this provision, an individual is no longer an inmate when released on parole, probation, supervised release, or otherwise is no longer in lawful custody.[33]

Parsing through the regulations, it appears that the

Department of Health and Human Services takes the approach that

---

[33] 45 C.F.R. § 164.512(k)(5).

correctional institutions may be either a non-covered entity [34] or a covered entity.[35] If the correctional institution is a non-covered entity, there appears to be no restriction on how the correctional institution uses or otherwise discloses the information so long as the institution represents it requires the PHI to fulfill one of the five purposes set forth in the regulation. If the correctional institution is a covered entity, then it may use the information "***for any purpose***" relating to the "safety, security, and good order of the correctional institution."[36] This is a distinction without a difference, as the impact is still the same: the correctional institution may use the PHI in any manner so long as it receives the PHI for one of the enumerated purposes. As set forth below, it appears the proper interpretation of the regulation is that the medical component of the correctional institution may be a covered entity while the overall institution is not, and if the correctional institution itself is a prison hospital (e.g., FMC Butner or FMC Devons), it is a covered entity.

It is important to note that the subsections of the regulation do not differentiate between covered entities providing health care services to inmates outside the institution and covered entities providing health care within

---

[34] 45 C.F.R. § 164.512(k)(5)(A)-(E)
[35] 45 C.F.R. § 164.512(k)(5)(F).
[36] *Id.* (emphasis added).

6448584

the institution.  That is, one may fairly read 45 C.F.R. §
164.512(k)(5)(A)-(E) as applying to covered entities providing
health care services outside the correctional institution which
receive requests from the correctional institution and 45 C.F.R.
§ 164.512(k)(5)(F) to apply to the correctional institution
itself through its medical staff.  This interpretation would
render the entire correctional institution, and its employees,
as a "covered entity," but it would make little sense.  Rather,
it appears that the correct interpretation is that 45 C.F.R. §
164.512(k)(5)(F) applies to the health care component of a
correctional institution as well as to outside providers, which
are separate and distinct from the correctional institution
itself.  This interpretation was clearly intended and adopted by
the Department of Health and Human Services when it originally
promulgated the final regulations.[37] For instance, in adopting
the final rule, the agency stated:

> First, to clarify that we are referring to individuals
> who are incarcerated in correctional facilities that
> are part of the criminal justice system or in the
> lawful custody of a law enforcement official—and not
> to individuals who are ''detained'' for noncriminal
> reasons, for example, in psychiatric institutions—§
> 164.512(k) covers disclosure of protected health
> information to correctional institutions or law
> enforcement officials having such lawful custody. ***In
> addition, where a covered health care provider is also
> a health care component of a correctional institution,
> the final rule permits the covered entity to use***

---

[37] 65 F.R.  82462, 82540-41 (December 28, 2000).

6448584

> ***protected health information in all cases in which it
> is permitted to disclose such information.***[38]

The example provided in the explanation of the final rule also

supports this interpretation:

> ***This section is intended to allow, for example, a
> prison's doctor to disclose to a van driver
> transporting a criminal*** that the individual is a
> diabetic and frequently has seizures, as well as
> information about the appropriate action to take if
> the individual has a seizure while he or she is being
> transported. We permit covered entities to disclose
> protected health information about these individuals
> if the correctional institution or law enforcement
> official represents that the protected health
> information is necessary for these purposes. ***Under
> 164.514(h), a covered entity may reasonably rely on
> the representation of such public officials.***[39]

Accordingly, although medical personnel within a

correctional institution may be considered covered entities

within the purview of HIPAA, the corrections staff and employees

are not.  Further, there are no restrictions on how the

correctional institution uses or otherwise discloses the PHI

once they receive the information, so long as it is initially

disclosed for one of the enumerated purposes set forth within

the regulation.  That is, other sections within the regulations

allow for the disclosure of PHI to non-covered entities so long

as certain conditions, restrictions and limitations are

satisfied after disclosure is made.  For instance, a covered

entity may disclose PHI in response to a subpoena, not

---

[38] *Id.* (emphasis added).
[39] *Id.* (emphasis added).

6448584

accompanied by a court order, only if notice is provided to the individual whose information is requested or a qualified protective order is in place.[40]  No such limitations and restrictions are placed upon the provision of PHI to correctional institutions.

The U.S. Department of Health and Human Services, Office of Civil Rights, appears to have reinforced this interpretation in a guidance document issued in the wake of COVID-19.[41]  In addressing HIPAA restrictions as they relate to correctional institutions, the agency stated:

> Yes, the HIPAA Privacy Rule permits a covered entity to disclose the protected health information (PHI) of an individual who has been infected with, or exposed to, COVID-19, with law enforcement, paramedics, other first responders, and public health authorities without the individual's HIPAA authorization, in certain circumstances, including the following:
>                         * * * * *
> - **When responding to a request for PHI by a correctional institution or law enforcement official having lawful custody of an inmate or other individual**, if the facility or official represents that the PHI is needed for:
>
>     o providing health care to the individual;
>
>     o the health and safety of the individual, other inmates, officers, employees and others present at the correctional institution, or persons responsible for

---

[40] 45 C.F.R. 164.512(e)(1)(ii).

[41] *COVID-19 and HIPAA: Disclosures to law enforcement, paramedics, other first responders and public health authorities*, U.S. Department of Health and Human Services, Office of Civil Rights, Guidance Document HHS-0945-F-2440 (October 2, 2020), found at: https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents//covid-19-hipaa-and-first-responders-508.pdf.

6448584

the transporting or transferring of
inmates;

o law enforcement on the premises of the
correctional institution; or

o the administration and maintenance of the
safety, security, and good order of the
correctional institution.

For example, HIPAA permits a covered entity, **such as a
physician, located at a prison medical facility** to
share an inmate's positive COVID-19 test results with
correctional officers at the facility for the health
and safety of all people at the facility. 45 CFR
164.512(k)(5).[42]

The guidance document went further, however, by acknowledging

that some entities, **including prison doctors**, may not be covered

entities that are required to comply with the HIPAA rules:

The HIPAA Privacy Rule limitations only apply if the
entity or individual that is disclosing protected
health information meets the definition of a HIPAA
covered entity or business associate. This guidance
provides examples of disclosures from certain types of
entities, some of which are covered by HIPAA, and
others that may not be. While the entities in the
examples are covered under HIPAA, **the examples are not
intended to imply that all public health authorities,
911 call centers, or prison doctors, for example, are
covered by HIPAA and are required to comply with the
HIPAA Rules**.[43]

If the agency responsible for enforcing HIPAA compliance is

not willing to commit to an interpretation of its own rule that

a prison doctor is a covered entity required to comply with

HIPAA rules, it stands to reason that, given both the plain

---

[42] *Id.*, at pages 1-2 (emphasis added).
[43] *Id.*, at page 1, fn. 2 (emphasis added).

6448584

language and the context of 45 C.F.R. § 164.512(k)(5), *a correctional institution need not comply with HIPAA's restrictions once it has received PHI for one of the enumerated purposes in the rule.*  In this sense, the correctional institution itself (as apart from its medical staff) is not a covered entity for which compliance is mandated, so long as the information is sought and used for one of the enumerated purposes.

    2.  <u>Interpretive Case Law</u>

Not surprising, there is a dearth of interpretive case-law on this precise issue.  The COVID-19 pandemic has forced all sectors of our society to re-examine how we approach public health policy issues vis-à-vis privacy and civil rights concerns.  Additionally, the resolution of any HIPAA analysis does not fully resolve the issue; there are still constitutional privacy concerns that must be considered.  Nevertheless, there are a few analogous cases which may provide some light on the contours of the HIPAA regulations and constitutional privacy protections as they relate to incarcerated individuals.

As to HIPAA interpretive case-law, the few cases which have addressed the HIPAA regulations relating to correctional institutions have focused on the ability of health care providers within the correctional institution to share PHI with officials within the institution.  The single reported case

6448584

involving the propriety of disclosure comes from the Kentucky Court of Appeals, which upheld the dismissal of an inmate's claim that the disclosure of his urinalysis test, positive for marijuana, constituted a HIPAA violation:

> The trial court dismissed the HIPAA claim pursuant to CR 12.02(a) for lack of subject matter jurisdiction. HIPAA does not create a state based private cause of action. See 42 U.S.C. § 1320d. The dismissal of the HIPAA claim was appropriate.
>
> Even if we assume the general applicability of HIPAA to this matter, 45 C.F.R. § 164.512 (2007) sets forth a number of situations in which covered entities may disclose protected health information without written authorization of an individual, or an opportunity of an individual to agree or object. Specifically, 45 C.F.R. § 164.512(k)(5) governs the applicability of HIPAA to correctional institutions. Under this subsection, covered entities are permitted to disclose to correctional institutions or law enforcement officers having custody of an individual the protected health information about an inmate for, inter alia, "[l]aw enforcement on the premises of the correctional institution," and "[t]he administration and maintenance of the safety, security and good order of the correctional institution." 45 C.F.R. § 164.512(k)(5)(i)(E), (F). In addition, the regulation further provides that "[a] covered entity that is a correctional institution may use protected health information of ... inmates for any purpose for which such protected health information may be disclosed." 45 C.F.R. § 164.512(k)(5)(ii). Thus, the urinalysis testing and reporting of the results did not violate HIPAA.[44]

Another somewhat analogous case placed the issue in the negative: a Pennsylvania jail could not hide behind HIPAA's privacy requirements to fail to provide medical information to

---

[44] *McMillen v. Kentucky Dep't of Corr.*, 233 S.W.3d 203, 205 (Ky. Ct. App. 2007).

staff.  In *Ferencz v. Medlock*, a district court in the Western
District of Pennsylvania denied summary judgment to a
municipality which claimed that HIPAA privacy restrictions
prohibited a jail medical facility to share an inmates suicidal
tendencies with corrections staff:

> In this case, numerous officers, including the control
> room and floor officers, testified that they were not
> notified that Stevens had been placed on any type of
> special watch. Obviously, a failure to communicate
> that an inmate was to be on suicide watch would
> frustrate efforts to prevent that inmate's suicide.
> The Court will not countenance Defendants' citation to
> HIPAA as a justification for their refusal to fully
> communicate Stevens' risk of suicide. As the
> Magistrate Judge aptly explained, HIPAA contains an
> exception which specifically permits use of such
> medical information by correctional institutions to
> protect the health and safety of inmates. R & R at 39–
> 41; 45 C.F.R. § 164.512(k)(5).[45]

These cases support the conclusion that covered entities are
provided wide latitude to disclose and use PHI to correctional
institutions for the legitimate purposes enumerated in the
regulations.  Other cases support the further regulatory
analysis that the correctional institutions and corrections
officers themselves are not "covered entities," and thus do not
appear to be required to comply with HIPAA's privacy
restrictions.

For instance, in *Winfree v. South Central Regional Jail,*
the district court dismissed an inmate's claim that a

---

[45] *Ferencz v. Medlock*, No. CIV.A. 11-1130, 2014 WL 3339639, at *5 (W.D. Pa.
July 8, 2014).

corrections officer violated his HIPAA and constitutional privacy rights by disclosing to other inmates his medical information with other inmates after he was mistakenly diagnosed with Hepatitis B.[46]  In so doing, the court noted that the jail itself and the corrections officer "who are not 'health care providers,' do not qualify as 'covered entities' subject to HIPAA's requirements."[47]  The district court in *Dunn-Fischer v. Reed*, reached an identical conclusion when it dismissed a complaint alleging that a corrections officers had improperly obtained and disclosed the medical condition of an inmate: "[h]ere, the defendants are not entities subject to the act; thus, allegations regarding violations of this statute cannot be asserted in this action."[48]  Accordingly, it appears that once a correctional facility and its officers are in legitimate possession of PHI, HIPAA's privacy requirements do not apply to them.  The HIPAA analysis, however, does not fully resolve the issue.  Correctional institutions and their staffs must be mindful of the limited constitutional privacy protections of the inmates under their charge.

---

[46] *Winfree v. S. Cent. Reg'l Jail*, No. 2:16-CV-06332, 2018 WL 737429, at *3 (S.D.W. Va. Jan. 16, 2018), *report and recommendation adopted*, No. 2:16-CV-06332, 2018 WL 736045 (S.D.W. Va. Feb. 6, 2018).
[47] *Id.*
[48] *Dunn-Fischer v. Reed*, No. 8:20-cv-03284 (HMH-KFM), 2020 WL 7060354, at *4 (D.S.C. Nov. 9, 2020), *report and recommendation adopted*, No. CV 8:20-3284-HMH-KFM, 2020 WL 7055516 (D.S.C. Dec. 1, 2020)

6448584

The Supreme Court has held that "imprisonment carries with it the circumscription or loss of many significant rights."[49] "Loss of privacy is an 'inherent incident[] of confinement.'"[50] Accordingly, the Court has instructed:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.[51]

A review of case law among the several circuits, including the Third Circuit, underscores the proposition that "prisoners do not have a constitutionally protected expectation of privacy in prison treatment records when the state has a legitimate penological interest in access to them."[52]  This is not to say that correctional institutions have free-reign to access and disseminate the private health information of inmates.  Rather, in the words of the Third Circuit, "the Fourteenth Amendment protects an inmate's right to medical privacy, subject to legitimate penological interests."[53]

---

[49] *Hudson v. Palmer*, 468 U.S. 517, 524 (1984).
[50] *Seaton v. Mayberg*, 610 F.3d 530, 534 (9ᵗʰ Cir. 2010) (quoting *Bell v. Wolfish*, 441 U.S. 520, 537 (1979)).
[51] *Hudson*, 468 U.S. at 527-28.
[52] *Seaton*, 610 F.3d at 534 & n. 18 (survey of cases).
[53] *Doe v. Delie*, 257 F.3d 309, 311 (3d Cir. 2001).  *See also*, *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir.1999) ("[T]his Court already has accorded constitutional stature to the right to maintain the confidentiality of previously undisclosed medical information. It follows that prison officials can impinge on that right only to the extent that their actions are `reasonably related to legitimate penological interests.'")

6448584

Correctional institutions in the United States faced a somewhat analogous situation to the COVID-19 pandemic in the 1980s and 1990s when they were required to address the HIV status of inmates.  In a series of cases across the country, circuit courts nearly uniformly held that the "identification and segregation of HIV-positive inmates serves a legitimate penological interest."[54]  Judge Posner of the Seventh Circuit addressed the issue and resolution very succinctly in a case where prison officials disclosed an inmate's HIV-positive status to other inmates:

> There is a great difference, so far as the balance between privacy and public health is concerned, between a communicable and a noncommunicable disease. A person with a noncommunicable disease is a danger only to himself, and the compelled disclosure of his condition to others is unlikely to further a legitimate interest of the state. But a person with a communicable disease is a danger to others — a grave danger when as in the case of HIV-AIDS the disease is invariably fatal and has already reached epidemic proportions. The fact that some methods of protecting the public from a communicable disease are barbarous, such as branding, does not entail that all are.
>
> **Neither in 1992 nor today was (is) the law clearly established that a prison cannot without violating the constitutional rights of its HIV-positive inmates reveal their condition to other inmates and to guards in order to enable those other inmates and those guards to protect themselves from infection.** *Cf*. *Camarillo v. McCarthy*, 998 F.2d 638 (9th Cir.1993). We

---

[54] *Moore v. Mabus*, 976 F.2d 268, 271 (5th Cir. 1992). *See also*, *Tokar v. Armontrout*, 97 F.3d 1078, 1084 (8th Cir. 1996); *Doe v. Wigginton*, 21 F.3d 733, 736-740 (6th Cir. 1994) (addressing the juxtaposed claims that initial denial of HIV test amounted to a constitutional violation and the alleged constitutional violation of disclosure of HIV-positive status by prison officials after a test had been given).

have held that the knowing failure to protect an
inmate from the danger posed by an HIV-positive
cellmate with a propensity to rape violates the
inmate's right not to be subjected to cruel and
unusual punishments.[55]

The Eleventh Circuit similarly held that there was a legitimate

penological interest in the forced testing and segregation of

HIV-positive inmates:

> In short, mandatory testing and segregation still
> apparently lies within the perimeter of an important
> correctional policy debate. As such, it represents
> precisely the type of urgent problem of prison reform
> and prison administration with which we as a court are
> "ill equipped to deal." [*Procunier v. Martinez*, 416
> U.S. 396, 405 (1974)]. The district court concluded
> that "knowledge of the identity of AIDS carriers is a
> matter reasonably related to a legitimate state
> interest":
>
> > It is inescapable that correctional systems
> > should attempt to (1) prevent high risk behavior
> > among inmates, (2) make reasonable efforts to
> > protect all inmates from victimization and (3)
> > avoid any practices which could lead to
> > unprotected blood exposure. The bounds of these
> > duties as they relate to AIDS, and whether
> > negligence or constitutional wrongs are involved,
> > have not yet been clearly defined. At this early
> > stage of the diagnosis and treatment of AIDS,
> > these matters should best be left in the hands of
> > prison officials with the help and advice of
> > their medical staffs.
>
> [*Harris v. Thigpen*, 727 F.Supp. 1564, 1581 (M.D. AL
> 1990)].
>
> Our application of the [*Turner v. Sefley*, 482 U.S. 78
> (1979)] "reasonable relationship" test to the DOC's
> policy of uniformly segregating those prisoners who
> test positive for HIV yields the same conclusion. The
> DOC's more conservative approach in separating all

---

[55] *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995).

known seropositives is not in itself constitutionally
violative. To the extent that the segregation policy
encroaches upon the privacy rights of HIV-positive
inmates, it is a reasonable infringement in light of
the inmate interests at stake (both seropositive and
general population), and the difficult decisions that
the DOC must make in determining how best to treat and
control within Alabama correctional facilities the
spread of a communicable, incurable, always fatal
disease.[56]

In a more recent case, the Eleventh Circuit held that a
prison's use of color-coded wristbands do not violate an
inmate's privacy rights under the Fourteenth Amendment.[57]  In
upholding the use of the wristbands, the court reaffirmed its
finding in *Harris'* that whatever privacy right an inmate has in
protecting his or her HIV status, it must be balanced against
the institution's penological interests.[58]

Based upon a review of the relevant case-law, therefore,
there does not appear to be an invasion of constitutional
privacy protections relating to an inmate's COVID-19 status
through disclosure (to staff and other inmates) and segregation,
and even if there were, such invasion would be slight, temporary
and justified to serve legitimate penological interests.

C.    <u>**Recommendation**</u>

The foregoing analysis leads me to conclude that, in order
to maintain the health and safety of the inmate population and

---

[56] *Harris v. Thigpen*, 941 F.2d 1495, 1521 (11th Cir. 1991).
[57] *Reed v. Allen*, 379 Fed. Appx. 879 (11th Cir. 2010).
[58] *Id.* at 882-83.

6448584

staff, and to promote the good order of the institution, the Cumberland County Jail should institute a color-coded wrist-band system that denotes those inmates who are isolated due to COVID-19 positive tests and those quarantined for suspected COVID-19 exposure.  As these inmates would be located in the same areas for presumably the same reasons (i.e., the quarantine area for COVID-19 positive and the isolation area for suspected exposure), the publication of their health status via a wristband would have no impact even if HIPAA rules were to apply.  The benefits of this wristband system are several:

- o Once a positive test is returned or information received that the inmate may have been exposed to COVID-19, the inmate receives a wristband, thus denoting that he/she cannot be placed into a cell with another inmate who is COVID-19 negative;

- o Corrections officers who must transport or otherwise accompany inmates who are COVID-19 positive or exposed will be on notice to take appropriate precautionary measures to protect themselves, other staff members and inmates; and

- o The wristbands serve as a secondary check on the written records of the facility indicating those who should be quarantined and/or isolated.

Consideration should also be given to whether a similar wrist-band system should be employed for inmates who have received the vaccine and/or recovered from COVID-19. Understanding that this may be a more controversial measure due to security factors, the benefits of promoting the overall health, safety and good order of the institution may outweigh

28

those concerns.  In short, if the goal of the institution (and indeed the country) is to achieve herd immunity, then it is important for the institution and its staff to know who has COVID-19 antibodies, either through recovery or vaccine. Realizing that the CDC's most recent guidance contain two sets of recommendations,[59] one for those who have been vaccinated and one for those who have not, it stands to reason that the Cumberland County Jail may want to loosen its COVID-19 masking and social distancing restrictions somewhat.  In order to do this, the corrections officers will have to know who has been vaccinated and who has not.  The easiest way to accomplish that goal is through a wrist-band system, which may also serve as an incentive for inmates to become vaccinated.  If you get the vaccine, you get to take your mask off and begin to resume normal activities, even if you have been exposed to someone who has COVID-19.

Accordingly, based upon the foregoing, it is my recommendation that:

1. The Cumberland County Jail develop a formal written policy, applicable to all employees, staff and contractors, directly addressing the Cumberland County Jail's response to COVID-19;

---

[59] See, e.g., CDC, Interim Public Health Recommendations for Fully Vaccinated People (Updates as of May 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.

6448584

2. Although the subsequent Initial Report and Recommendation will address the parameters and contents of that policy, as an initial matter, the policy must at a minimum contain written procedures for identification (i.e., testing), isolation and quarantining of all inmates who are infected, or are suspected of being infected, with COVID-19;

3. The policy must contain procedures for testing all new inmates coming into the Cumberland County Jail as well as procedures for any inmate presenting with one or more symptoms of COVID-19;

4. The policy must include a mandatory requirement that inmates who have tested positive for COVID-19 are quarantined from others and that inmates who are suspected of having been exposed to COVID-19 are isolated from others for such times as recommended by the Centers for Disease Control;

5. The policy must include a mandatory requirement that those who are infected with COVID-19 cannot be isolated or quarantined with individuals who are suspected of having been exposed to COVID-19, who have tested negative for COVID-19, have recovered from COVID-19, or who have been vaccinated;

6448584

6. The policy must include a wristband system by which staff and contractors may clearly identify those inmates who are required by the policy to be isolated and/or quarantined;

7. The wristband system must clearly differentiate between those inmates who are infected with COVID-19 from those who are suspected of having been exposed to COVID-19;

8. The policy must require that once an inmate has been identified as having been infected with COVID-19 or suspected of have having been exposed to COVID-19, the inmate is *immediately* provided with the wristband denoting that the inmate must be quarantined or isolated from others;

9. The policy must identify who is responsible for ensuring that the appropriate wristband is issued to an inmate immediately upon the determination of an inmate's COVID-19 status;

10.    The policy must identify who is responsible for ensuring that the inmate's cell placement is changed once an inmate's COVID-19 status changes;

11.    The policy must identify the supervisory personnel responsible for ensuring on a daily basis that no inmate who has COVID-19 is placed in a cell with an inmate who is suspected of having been exposed to COVID-19 or is COVID-19 negative;

6448584

12.     The policy must require that the wristband is immediately removed once an inmate's status changes (i.e, once the quarantine or isolation period has ended).

13.     The policy may include an additional wristband component that will identify those inmates who have been vaccinated and/or possess COVID-19 antibodies;[60]

14.     The policy must be prepared and finalized within seven (7) days of the entry of the Court's Order adopting this Partial Initial Report and Recommendation along with any modifications;

15.     The policy must be implemented within fourteen (14) days of the entry of the Court's Order adopting this Partial Initial Report and Recommendation along with any modifications; and

16.     Within Ten (10) days of the entry of the Court's Order adopting this Partial Initial Report and Recommendation along with any modifications, the policy must be distributed to all personnel at the institution, who must acknowledge in writing that they have reviewed the policy and understand their obligation to comply with the policy.

---

[60] This recommendation may be amended to be a requirement after the completion of the investigation and evaluation of the Cumberland County Jail in accordance with the Court's instructions. In the meanwhile, CCJ should weigh the benefits of such a system against any potential security concerns.

6448584

As stated previously, these are just partial initial recommendations.  The subsequent Initial Report and Recommendation will more fully address the concerns and issues raised by both Plaintiffs' and Defendants' counsel during this preliminary phase, as well as the other issues the Court has instructed me to address.  The regulatory analysis and resulting recommendations contained herein will serve as the foundation for the more comprehensive recommendations.

Respectfully submitted,

WILLIAM J. HUGHES, JR., ESQ.
Porzio, Bromberg and Newman, P.C.
Appointed Master of the Court

Dated: June 15, 2021

33

6448584